THE PEOPLE of the STATE of CALIFORNIA, at the Re-
lation of the ATTORNEY-GENERAL, Appellants, *v.* ALEX-
ANDER WELLS, Respondent.

A constitutional officer cannot be divested of his office, otherwise than as pre-
scribed by the constitution of the State.

*Quere?* Whether the absence of a judge from the State, is such a vacancy as
can be supplied by the executive, under an act of the legislature authorising
such appointment?

*Quere?* Whether a statute authorising the Governor to appoint a special Judge
of the Supreme Court, or of a District Court, during the absence of a judge
of such Court from the State, is constitutional?—C. J. MURRAY and Justice
ANDERSON were divided in opinion.

APPEAL from the Fourth Judicial District.

This cause was submitted to the Court upon the following
agreed case:

"It is agreed by S. C. Hastings, Attorney-General, on the
part of the People, and by Alexander Wells, respondent, in
proper person, that the case herein shall be presented to this
Court as though judgment had been entered *pro forma* for the
respondent, in the District Court of the Fourth Judicial District
of the State of California, upon a writ of *quo warranto,* issued
out of said District Court, and in the same manner as if all the
necessary proceedings were had upon the return of such pro-
ceeding, to enter up judgment in favour of the respondent, as
aforesaid : and also in the same manner as if the necessary pro-
ceedings had been taken to bring and perfect an appeal from
such judgment to this Court; and that the decision of this Ap-
pellate Court shall be entered, and have the same effect as if all
the proceedings necessary for such appeal, had been duly taken
by the appellants in this case. And it is further stipulated and
agreed, as the case or statement of facts in this proceeding, that
Solomon Heydenfeldt was duly elected and commissioned, as one
of the Justices of the Supreme Court, for the term of six years
from the first day of January, 1852; that in the month of Feb-
ruary, 1852, he obtained leave of absence from the State for the
term of six months; that such leave was granted by a joint reso-

lution of the two branches of the legislature of this State; and
that on or about the first day of March last, he departed from
this State to return to, and has returned to the State of Ala-
bama, the place of his former residence; that on the 27th day of
March last, a law was duly passed by the legislature, providing:
Sec. 1. "The Governor of the State shall supply, by appoint-
ment, the temporary vacancy caused by the absence of a Judge
of the Supreme Court, or of a Judge of any of the Courts of
this State. Such temporary judge so appointed, shall take the
oath of office before entering upon the discharge of its duties,
and be entitled to hold said office during the vacancy thereof,
and no longer; and shall receive a compensation at the rates
now fixed by law, and which shall commence from the date of
his entering upon the duties of his office." That under and by
virtue of said law, the respondent was duly appointed and com-
missioned by the Governor, on the 2nd day of April instant;
and that on the 6th day of April instant, he took the constitu-
tional oath, and entered upon the duties of said office; that the
commission of the respondent is in the words and figures follow-
ing, to wit: 'United States of America, State of California.
To all to whom these presents shall come, Greeting. Know ye,
that reposing special confidence in the capacity, integrity, and
fidelity of Alexander Wells, I, John Bigler, Governor of the
State of California, in the name and by the authority of the
people of said State, do by these presents appoint and commis-
sion him, the said Alexander Wells, as Justice of the Supreme
Court of the State of California, to supply the vacancy occa-
sioned by the absence of Solomon Heydenfeldt. In testimony
whereof I have caused the Great Seal of the State to be here-
unto affixed, at the City of Sacramento, the second day of April,
in the year one thousand eight hundred and fifty-two. John
Bigler, Governor. By the Governor, W. V. Voorhies, Secretary
of State. [L. s.]' And it is further agreed and stipulated,
that the question or point of law to be submitted to this Court
in this case is, whether the law under which such appointment
was made is valid, or whether it is unconstitutional and void. S.
C. Hastings, Attorney-General. Alexander Wells, in propria
persona."

The cause was argued by the *Attorney-General*, for the appellants; and by the *Respondent*, in person, and *Gregory Yale* and *R. A. Lockwood*, as his counsel.

The only brief on file is that of *R. A. Lockwood;* in which the following points are made. 1. The rules applicable to the powers of Congress, are inapplicable to the powers of the State legislature; because the constitution of the United States is a *grant* of power, beyond which Congress have no authority; but the constitution of the State is a *limitation* of power; and the legislature possess *all* power not *prohibited* by the constitution. The case of Field, cited from Scammon's Reports, in Gilmon's Digest, p. 182.  2nd. The case cited from the South Carolina Reports, by the other side, is inapplicable; because, by the constitution of that State, the appointing power was vested in the legislature; and *in no case* could the Governor appoint.  3d. It is only by *implication* that the act in question can be said to be unconstitutional; and the judiciary will not decide that a State legislature has transcended its powers, when the act in question is not *directly* in conflict with the restraints of the constitution. See 5 Louisiana Ann. Reps. 758.  4th. Cotemporaneous legislative exposition and judicial acquiescence, are powerful arguments in favour of the constitutionality of legislative acts.  See 5 Louisiana Ann. Reps., supra; and the case cited by the respondent from 1 Cranch 299.  5th. Other States, with constitutions similar to ours, have passed laws similar to the one in question; and their validity has been recognised.  See the case in 5 Louisiana Ann. Rep., supra; 1 Greiner's La. Dig. p. 93, secs. 574-7. 579.  6th. No decision can be adduced, declaring a law like the one in question unconstitutional: but this Court, in the case of McAuley, (a capital case,) decided that such a law is constitutional.  It is impossible to distinguish the *principle* involved in that case from the principle of this; though the reasoning of the judge does not come up to this case.  The question, then, so far as *authority* is concerned, is *settled;* and ought not to be disturbed.  7th. But it is conceded that the constitution *expressly* vests the power of supplying vacancies in the executive and legislature; (in the executive, where the constitution "and laws" provide no mode;—here, "the laws" provide the mode:) and that, too, in

cases of vacancy "from any cause." Now, a *judicial* declaration that a vacancy exists, *cannot* precede the exercise of this appointing power; because, if there be a vacancy, there can, (or may,) be no judiciary. It results, then, that the question of vacancy is within the competency of the legislature, *ex necessitate;* and where the *subject-matter* is within their competency, the *mode,* &c., are exclusively matters of legislative discretion. 8th. The argument as to the danger of legislative encroachment, is misplaced. The same might be urged as to the danger of judicial encroachment. 9th. The South Carolina case explicitly recognises "absence from the State," as *one* kind of vacancy. See p. 662. 10th. It is a mere assumption, that a "vacancy" can exist only when it is "absolute," or permanent. No authority is adduced to support the position; and reason, practice, and the South Carolina case, show that there may be a temporary vacancy. Our constitution also recognises a temporary vacancy in the office of Governor, &c.; and yet there can no more be *two governors,* (in the abstract,) than *four judges* of the Supreme Court. 11th. The argument on the other side confounds the "office" of judge, as a *property,* &c., with the "office," as a *function;* and yet they are very distinct. The "Court," (in which the judicial power is vested,) shall *consist* of *three judges,* (no particular *persons:*) and if 500 persons should be appointed, or elected, and authorised to sit in turn, &c., each might be said to hold the "office" of judge, as a property, &c.; and yet the "Court" would never consist of more than "three judges." The three judges constituting the "Court," are *impersonal.* 12th. The case shows that Judge Heydenfeldt was in Alabama when the respondent was appointed. Certainly, then, he did not "fill *the* place of *the* judge," constituting a part of the "Court." There was, therefore, (even according to the Dictionaries,) a "vacancy,"—"a place not filled." What place? The *forum,* appointed by law for the exercise of the functions of the Supreme "Court." 13th. Every principle of convenience and public good is in favour of the validity of this law. 14th. To hold this law unconstitutional, would, (by the necessary operation of the principle on which such decision must rest,) render void the joint resolution granting leave of absence to Judge Heydenfeldt; and

*then*, the commission to the respondent, being to fill a *vacancy* caused by the *abandonment* of the incumbent, must be valid. "In case of a vacancy from any cause, the Governor may appoint," &c. This Court cannot go behind the commission, if it be decided that the legislature have no power over the subject of vacancy, &c.; because the Court cannot *then* hold that Judge Heydenfeldt has leave of absence. In short, to establish the principle contended for, would lead to incalculable mischief. 15th. If, as urged on the other side, granting leave of absence would amount to revolution, what would an act declaring that the Supreme Court should sit only for one hour, at intervals of one hundred years, amount to? Such an act would certainly be constitutional; for the constitution expressly gives the legislature power to fix the time and place of holding courts.

The judges disagreeing, separate opinions were delivered, as follows:—

Chief Justice MURRAY. This Court is called upon to adjudicate a question of grave importance, not only to the respondent, but to itself, to those whose rights may be affected by our determinations, and to the whole public, who are interested in the proper administration of justice. In order to understand and correctly solve this difficult question, it is necessary to strip it of all the incumbrances arising from supposed consequences, and inquire what are the strict constitutional rights of the respondent. Extreme cases should seldom be resorted to as arguments; for there is no proposition in moral science, however well received, to which there may not be some exception, without which dangerous and absurd consequences might result.

Art. 6, sect. 2 of the Constitution of this State provides that, "The Supreme Court shall consist of a chief justice, and two associate justices, any two of whom shall constitute a quorum." Sect. 3d. "The Justices of the Supreme Court shall be elected at the general election, by the qualified electors of the State, and shall hold their office for the term of six years from the first day of January next after their election; provided, that the legislature shall, at its first meeting, elect a Chief Justice and two

Associate Justices of the Supreme Court, by joint vote of both Houses, and so classify them that one shall go out of office every two years. After the first election, the senior justice in commission shall be the chief justice." Sect. 15th. The Justices of the Supreme Court, and the Judges of the District Courts, shall severally, at stated times during their continuance in office, receive for their services a compensation, to be paid out of the treasury, which shall not be increased or diminished during the term for which they shall have been elected."

These are all the provisions of the Constitution which directly relate to the organization of this Court:—from which it will be seen that the Constitution provides, 1st. The judges shall be elected by the people for the term of six years. 2d. The Court shall consist of three members. 3d. They shall receive a compensation which shall not be increased, &c. Without the aid of some other constitutional provision, it would be impossible to constitute any one a judge except in accordance with these three provisions. This difficulty is obviated, however, by the 8th sect. of the 5th art., which provides that "Where any office shall, from any cause, become vacant, and no mode is provided by the Constitution and laws for filling such vacancy, the Governor shall have power to fill such vacancy by granting a commission, which shall expire at the end of the next session of the legislature, or at the next election by the people." It is contended that this section gives to the legislature the power of providing for vacancies; and the subject being within their control, they have authority to say in what manner the same shall be exercised. Offices are classed by Blackstone among incorporeal hereditaments; and an office is said to be the right to exercise a public or private employment, and to take the fees and emoluments thereunto belonging: whether public, as those of magistrates, or private, as those of bailiffs, receivers, &c. An office may further be said to be a vested right:—the officer has an estate in it as a property, of which he cannot be divested, except in the manner we will hereafter notice. Under our system of government, it may be regarded as a contract between the State on one hand, and the individual on the other, whereby he assumes the performance of certain duties for a certain compensation. For these purposes he becomes seised of the office, as of any

other property, in the right and enjoyment of which he cannot be disturbed or defeated, except by operation of law. There is also a difference between judicial and ministerial officers. A ministerial office may be administered by a deputy, but a judicial office cannot; the duties of the office must be discharged by the judge himself; for it may be possible he was elected on account of his known views, and the decisions it was reasonable to suppose he would make. At common law, all officers of justice had estates in their offices for life, and could not be removed but for misdemeanors. According to Lord Coke, an office became forfeited in three ways; 1st, by abuse; 2d, *non user;* 3d, refusal.

Admitting, for the present, that the legislature have power to direct the mode of supplying vacancies in all offices, constitutional as well as those of legislative creation, and that they may either elect, or delegate their power of appointment to the executive,—it is necessary to the complete exercise of this power that they should possess the further power of declaring what shall constitute a vacancy, and annexing conditions to an office rendering it vacant other than those provided by the Constitution ; thus disturbing or destroying the vested right of the incumbent. Vacancy is a fact the existence of which, like that of any other fact, is susceptible of being ascertained. Vacancy in an office can only be said to exist when the office or place has no legal incumbent to discharge the duties of the office. The law does not presume that every temporary absence from the discharge of the duties of the office creates a temporary vacancy. Here it is admitted that there is a proper officer, elected and qualified to discharge the duties of the office, whose right, if present, would be undisputed. How, then, can the office be said to be vacant? The incumbent is not at present discharging his duties ; but his place is not vacant for that reason, and cannot become so without the proper judgment of law. The word vacancy must be taken in the sense in which it was used by the framers of our *Constitution,* and cannot receive a definition from the legislature different from its known signification. If the legislature were at liberty to construe the words of the Constitution different from their plain meaning, they might alter the sense of the whole instrument, and defeat the intention of its framers. But it is said, the incumbent is not in the performance

of his judicial duties, and the legislature have made absence from the State a temporary vacancy. As I before said, the legislature may provide how a vacancy shall be filled, but it has no power to say what shall constitute one. If they possess the power of declaring what shall constitute a temporary vacancy, what is to prevent them from declaring what shall constitute a permanent vacancy? If such power belongs to the legislature, they may interfere with all property in office;—not by abolishing the office itself, for this they cannot do, but by creating new and independent conditions, the happening of which will create a vacancy; or by the still more summary mode of declaring that a vacancy does exist. The words in the Constitution, "vacancy in any office from any cause," must be construed vacancies in constitutional offices from any cause which would operate a vacancy under the Constitution, and vacancies in offices created by the legislature from any cause provided by law. If a different construction could be maintained, the legislature might indirectly defeat the election of every officer, by declaring that not only absence from the State, but sickness, religious persuasion, or a refusal to comply with the thousand conventionalities of life, should work a vacancy,—depriving the officer of his estate in the office, and the term provided for in the Constitution. Allowing the argument urged by the respondent, it must be borne in mind that the Constitution provides that the commission shall expire at the end of the next session of the legislature, or the next election by the people. Here is a Constitutional Term: yet the act under consideration may extend to the appointment of the respondent beyond the time when the appointing power returns to the hands of the people by the Constitution, and thus deprive them of the right of electing their judges.

And here I might well conclude; (for, as remarked by the learned counsel for the respondent, questions of this character do not admit of any extended range of argument, but address themselves at once to the sound discretion and understanding of the Court, so that they may be almost determined at a glance :—) were it not that many important considerations and ingenious arguments have been presented to the Court, which it is proper to notice. It is said that Courts will not declare a law unconstitutional unless it conflicts directly with the plain meaning of the

Constitution; that the Constitution does not *in terms* declare that there shall not be more than three judges; and that this act therefore conflicts only by implication with the Constitution. An affirmation often conveys a negative signification as strongly as if it were expressed in direct language. The Constitution of this State provides that every white male citizen of the age of twenty-one years shall be entitled to vote; and it would not be seriously contended that this affirmative declaration did not exclude those who are not white from the right of suffrage. Constitutions are always written in general language; and it would be inconvenient and impossible to specify, in so many words, each power granted or withheld. The words, "shall consist of a Chief Justice and two Associate Justices," limit the number, and *ex vi terminorum* forbid the possibility of there being more than three.

It is said that there is a difference between the office as a property, and the officer as a functionary; that while the Constitution declares the Court shall consist of three Judges, they are no particular persons; and if five hundred persons should be appointed or elected, and authorized to sit in turn, each might be said to hold the office of Judge as a property, and yet the Court would never consist of more than three Judges; that the three Judges constituting the Court are impersonal. It is true there is a difference between the office and the officer, in legal contemplation; but when the Constitution declares the Court shall consist of three Judges, who shall be elected in a certain way and at a certain time, to discharge the functions of that office, it cannot properly be said that those functions can be discharged by any one else. The fact of election or appointment devolves the duties of the office upon the person so appointed. It is singular if justice can be said to exist without the corporeal presence of the person elected by law to administer it. If the Judges are impersonal, how can we determine who are proper Judges? If the assumption that the Court is invisible, is to have any weight, either by way of illustration or argument, how are we to determine, without the aid of supernatural power, that there is not an incumbent in the place of Mr. Justice Heydenfeldt? In order to ascertain this fact, we are compelled to look for the Judge as an individual, to establish his absence as an officer;

thereby admitting his-identity, and that he is not impersonal, as contended. But this argument is more metaphysical and ingenious than substantial. The provision of the Constitution means simply that three persons shall be elected, which three persons shall compose the Court, and discharge the duties of the office of Judges of this Court.

It is said that this point has been substantially settled by this Court in the case of McAuley *v.* The People; by the Supreme Court of Louisiana, in the case of The State *v.* The Judge of the Fifth District, 5 Ann. Reps.; and by the Supreme Court of Indiana, in a case of a similar nature; in all of which cases it was held that the legislature might authorize the Judge of one District or Circuit to hold Court in another District or Circuit during the absence, sickness, or temporary disqualification of the Judge of the latter. In the case of McAuley, this Court held that the legislature had authority under the section of the Constitution which authorizes the legislature to alter or create new districts, from time to time, as the public good may require, to authorize the Judge of the Ninth Judicial District to hold a special term of a Court in the Seventh Judicial District. In the case cited from Louisiana, the Court say that the exercise of this power does not conflict with any constitutional provision. I have been unable to procure the case cited from Indiana; but all these cases are reconciled upon the ground that the District Judges are State officers of equal power and dignity, and Judges of Courts of the same original jurisdiction. Their jurisdiction is not necessarily confined to one particular district, although the Constitution, for greater convenience, provides that they shall be elected by districts. Thus elected, they are Judges of the State, subject to perform their duties wherever the legislature may direct. The fact that the Constitution of Louisiana provides that each Judge shall reside in his own district, adds no weight to the argument, as it was doubtless so provided for the convenience of the public, and to promote the certainty of justice. In fact, the whole argument may be summed up in a few words. The Constitution provides that a Judge shall be elected in each district; but does not expressly, or by necessary implication, declare that his jurisdiction shall be limited to that district. The legislature, by virtue of its power to alter the various districts, as well as by

the power to make proper regulations for the due administration of justice, as also in the exercise of all power not prohibited, (as contended for,) are competent to pass such an act.   But there is little or no analogy between these cases and the one at bar, or an attempt by the legislature to clothe a person with the attributes of Judge, in defiance of the direct provisions of the Constitution, and the rights of others.

. It is said that contemporaneous legislative exposition and judicial acquiescence are entitled to be regarded as authority in favour of the constitutionality of legislative acts.   It is not my purpose to dispute this proposition, or deny the weight of authority on which it rests.   This Court has repeatedly recognized the doctrine.   In fact, the argument based on this ground addresses itself with more force to the consideration of the Court, than any other which has been adduced.   But when we reflect that this State is in its infancy, called into existence under a new and anomalous state of things, that its wants have so far been supplied by but three legislatures, composed, for the most part, of men of little legislative experience, and less legal attainments, we cannot wonder that legislation upon many subjects has been crude and ill advised.   In fact, it is rather a matter of astonishment that so much has been accomplished that is useful and substantial.   We may be regarded almost as much the contemporaneous exponents of the Constitution as those who composed the first legislature.   When certain constitutional constructions have been acquiesced in for years, under which vested rights have grown up, it would be dangerous to disturb them, and better on the ground of public policy, to sanction than destroy public confidence, by inquiring whether they are correct or not.   But it is no argument, where a grave and important question, affecting the rights of the whole community, is brought before a Court, and that, too, the first time the right is sought to be exercised, to say that the hasty and inconsiderate legislation of three winters has determined the point, and because a law has slumbered thus long, it cannot now be disturbed.   Such a decision would conclude this Court upon every other question of a similar nature ; and we would be powerless to interfere with the grants of monopolies and charters, and other unconstitutional acts, with which almost every page of the statute book is covered.

It is true that the legislature have provided for filling a temporary vacancy in the offices of Treasurer and Comptroller. How far such appointments would be valid, it is not my purpose to determine. They are ministerial offices, and possibly might be administered by deputy; in which respect they differ from a judicial office, as I have before observed. The legislature have also passed other laws, the validity of which must depend on this decision. But this is the first time the question has been raised; and the acquiescence in these laws is not of sufficient duration to repel the inquiry now made.

It is said that the Judges of this Court have recognized the authority of the legislature, by asking leave of absence from the State. I have always regarded legislation on this subject as use-less, except so far as it might be considered a pledge of good faith on the part of the legislature, not to impeach the officer for absence, or neglect of duty. This, doubtless, was the understanding of the members of this and other Courts, who chose rather to ask a favour which would not be denied, than to make this issue with the legislature. If the legislative history of the present act were examined, it would not add any weight to the position contended for. At the last session of the legislature, an act similar in its provisions was passed and repealed almost in the same hour; and during the present session, the act under which the respondent was appointed, was declared unconstitutional by almost every gentleman of respectable legal attainments on the floor of the House. The fact that the legislature of Louisiana have passed a law authorizing the executive to appoint to fill a temporary vacancy, can have no great weight upon this subject. The question does not appear ever to have been determined; at least we find no adjudication upon the subject. It is said that the Constitution expressly vests the power of supplying vacancies in the legislature and executive where the Constitution and laws provide no mode; but that in this case, the laws provide the mode, and that in the case of a "vacancy from any cause;"— that a judicial declaration that a vacancy exists cannot precede, because if there be a vacancy, there can be no judiciary; that the question of vacancy is within the competency of the legislature, *ex necessitate;* and where the subject-matter is within their competency, the mode, &c., are exclusively matters of legislative

discretion.   This conclusion can only follow from confounding the power of the legislature to declare the mode in which a vacancy shall be filled, with the power of defining what shall constitute a vacancy.   The legislature may provide for filling the vacancy, and for ascertaining the existence of it, as they might the existence of any other fact, either by judicial or executive investigation: but it is not necessary to the complete exercise of this power for them to say that a vacancy shall occur for new and independent causes, other than those comprehended by the Constitution, and that the rights of the officer or of the public shall be determined by legislation of such a character.   I would not be understood as contending that a judicial declaration must precede the supplying of a vacancy.   The legislature may make that declaration themselves; but it must be based upon the happening of one of those events which by the Constitution would work a vacancy.   Suppose, for the sake of illustration, that the legislature should declare my seat upon this bench vacant because of my death, when in fact I was alive, and commission A. to fill my place,—would this determination conclude my right to the office?—and yet is not this within the competency of the legislature?   Again, the legislature may, in the plenitude of the power which is accorded to them, say that a vacancy has accrued by reason of my not having attended Divine service upon a particular day; and this would be within their power, according to the respondent's views, "because the subject of vacancies is within their competency, and *ex necessitate*, the mode, &c., are exclusively matters of legislative discretion."   But it is not necessary to pursue the subject further, as the consequences resulting from such a doctrine are too enormous to require any serious demonstration of the fallacy of the argument on which it is based.

It is said that our Constitution recognizes a temporary vacancy in the office of governor; and that there cannot be two governors, in the abstract, any more than there can be four judges.   It is sufficient, by way of answer, to say that the Constitution has declared what shall constitute a temporary vacancy in the office of governor, and provided how the same shall be supplied; while it is silent with regard to every other officer.   It is fair to suppose, upon every rule of construction, that if vacancies for temporary

incapacity in other constitutional offices had been contemplated, they would have been provided for.

I come now to the argument relied on so much, that unless the legislature has power to declare what shall constitute a vacancy, either temporary or permanent, there may be a failure of public justice arising from the absence of the judges from the State, or that it will be impossible to provide for the case of lunacy, or the conviction of crime, of the members of the bench.   Sect. 18, Art. 11 of the Constitution authorizes the legislature to pass laws excluding from office, and from the right of suffrage, those who may be convicted of forgery, perjury, bribery, and other high crimes; so that one portion of the argument falls to the ground, by virtue of the proper corrective in the legislative power.   Sect. 19, Art. 4, provides that the judges of this Court may be impeached for misdemeanors in office; so that if a judge of this Court should wilfully neglect his duties, or leave the State, he would not continue inaccessible, as contended, but might be reached by impeachment.   It is more difficult to say what course should be pursued in a case of lunacy.   The Constitutions of most States have provided for these cases.   This seems to be an oversight in our Constitution.   The fact of lunacy cannot properly be called a misdemeanor; and it would be a strange and inhuman spectacle to witness an impeachment, not for any act of the officer, but the visitation of Providence.   "Insufficiency is an original incapacity, which creates a forfeiture of the office."   5 Bac. Abr.   I am inclined to the opinion that in such a case, a Court, treating the office as a contract whereby the officer agreed to perform the duties for a certain compensation, might properly hold that the incapacity on the part of the officer to perform, determined the contract, and defeated the estate he had in such office.   If such a decision could be considered as a fraud upon his rights, it might be regarded as one of those pious frauds, at which the law would wink.   This, however, is an extreme case; and it is much to be hoped, that neither Providence nor the electors of the State, will ever afflict the public with an incompetent and imbecile judge.   I do not consider it necessary to allude to, or notice at length the analogy sought to be established between the Supreme Court of the United States and this Court.   There is a radical difference in

the law of their organization, as well as in the rules which apply
to the construction of the powers of Congress, and the powers
of the State legislatures.   The case in Cranch, for the purpose
of this argument, proves nothing.   The Court there held, that
though the constitutionality of their appointment as circuit
judges was doubtful, the question might be considered as judi-
cially determined, after it had been acquiesced in by them for
eight or nine years, and ought not to be disturbed.   That is not
this case.   The right here is for the first time sought to be en-
forced.   I have always been of opinion, that vacancy in a con-
stitutional office could only happen upon the death, resignation,
or impeachment of the incumbent, in the absence of other provi-
sions of the Constitution upon the subject.   While I recognize
the doctrine that the constitution is only a restriction upon the
legislative branch of the government, and a special grant of
power to the other departments, I am satisfied that where the
constitution has created an office, and provided how it shall be
filled, and the qualifications necessary to the incumbent, the
legislature, by necessary implication, are estopped from annexing
other conditions, or determining the office by the occurrence of
any event anterior to the expiration of the constitutional term.
I have been unable to find any express adjudications upon the
subject, for the simple reason, as I suppose, that the fact has
never been questioned.   This doctrine was laid down by the
Court in the case of Johnston *v.* Wilson, 2 N. Hamp.   The de-
cision did not, however, turn upon this point; and the *dictum* of
the Court is only valuable because it takes the matter for granted,
or as not admitting of any argument.   In the case of Barker *v.*
The People, 3 Cowen, the Court held that the legislature had no
power to fix arbitrary exclusions from office, or to attach other
conditions than those imposed by the Constitution.   It is not
proper to argue the hypothesis that legislative bodies are always
corrupt, and disposed to break through the restrictions which the
organic law of the land has imposed upon them.   Yet there
should be some independence in the co-ordinate branches of
government, and some point at which the interference of the
legislature should stop.   This can only be accomplished by a
strict adherence to the rule, that constitutional offices only
become vacant by some express provision of the constitution,—

by death, resignation, or removal by impeachment, for proper cause. And we may say with propriety, and upon the authority of the cases cited, that if the legislature are not restricted, the permanency and independence of every office rests upon their discretion. In the case of Cohen *v.* Hoff, S. C. Rep., the Constitution of South Carolina provided that the judges should be elected by joint ballot of both houses, during good behaviour, &c. There was no clause in the Constitution authorizing the legislature to provide for vacancies. Upon the argument of the respondent's counsel, the Constitution not having specially denied the exercise of this power, it properly belonged to the legislature : yet the Court held that the provision made by the Constitution necessarily excluded any other mode of filling the office, and that an act to provide a special judge for a special term, was unconstitutional. The very organization of our State government forbids the exercise of such a power. The several departments were intended to be kept separate and distinct, within their proper spheres ; and it never was designed that the legislature should intrude upon any of the co-ordinate branches in any way whatever. It is said that the Constitution only intended to separate and define the powers of the different branches of government, so that we should not exercise functions belonging properly to another ; that it is impossible for the different branches of government to exist independent of each other ; that the judiciary was inert until called into existence by legislative enactments ; that it owes its process, terms of court, and in fact every thing it possesses, to the aid of legislative enactment. The powers of the different branches of our government are defined and classified by the Constitution. The legislature has the exclusive right to provide remedies, process, &c. ; but the framers of that instrument intended something more than a mere division of powers when they provided the mode and time of electing the number of judges, and their compensation. The judiciary were placed upon a high and solid platform, beyond the reach of hasty and inconsiderate legislation, of public assemblies, or the withering influence of party strife. It is true that all the branches of government are, to a certain extent, dependent on each other, and must rely upon the sense of justice which all are supposed to possess. But to say that the judiciary have no power to pro-

tect themselves from legislative interference, would be to confess our own abject weakness, and acknowledge a power in the legislative branch of government more colossal than that of the British Parliament itself.    This Court is asked what would have been the result if the legislature had failed or refused to organize a judiciary at all, or the consequence of a law providing that this Court should meet but once in a hundred years, and its sessions be limited to one day, or one hour.    If it is possible to imagine an assembly of men so lost to their duty that they could be guilty of such gross neglect or corruption, it is but natural to suppose that their constituents would correct the evil through the ballot-box, or even by revolution itself, if necessary.    An attempt has been made to connect the appointment of the respondent with the joint resolution granting leave of absence to Mr. Justice Heydenfeldt; and it is contended that the resolution must be conclusive upon the Court ; that if the legislature had no authority to grant such leave of absence, there is an abandonment of his term ; and the respondent is properly appointed to fill the vacancy.    I do not consider it necessary for me to defend Justice Heydenfeldt's right to his seat on the bench. There is no pretence that it is forfeited; and I am fully of opinion that the legislature have no power to fetter his rights of locomotion.    When he is impeached for absence, it will be time enough to inquire if his place is forfeited.    Although I have ever considered it the duty of Courts to decide the law, without regard to consequences, and that a resort to arguments of expediency and public convenience is highly undignified, yet it may not be improper to say that much of the argument in this case drawn from necessity,—the supposed failure of public justice, and the inconvenience and delay to litigants,—is without any foundation. The Constitution does not contemplate that all three of the judges shall be constantly upon the bench.    It has provided for the absence or indisposition of the members by declaring that "any two shall constitute a *quorum*."    This Court has been organized a little more than two years ; during which time it has moulded a system of practice which has become understood and recognized throughout the State, notwithstanding the discordant and incongruous materials which composed and characterized our jurisprudence, and the anomalous and perplexing questions,

without any controlling precedent, which have daily presented themselves. In spite of the obstacles thrown in its way by private malice and abuse, as well as the interruptions of public clamour raised by disappointed, and too often, unscrupulous litigants; without books or proper conveniences, it has succeeded in dispatching all the business that has been brought before it, so that there is not at present a single case of the last term undisposed of; and this too with scarcely ever more than two judges present on the bench at the same time. The Constitution contains within itself a proper corrective for any consequences that may flow from this decision, without the necessity of the interposition of a convention, as generally supposed. If experience should demonstrate that the exercise of this power by the legislature is necessary to a complete provision for the administration of justice, it would be better to throw the burden upon the people of making such change, than for this Court to sacrifice its own independence. It is the duty of Courts to preserve their own integrity *intact ;* and no considerations of public convenience should ever induce a sacrifice of their constitutional rights.

For these reasons, I am of opinion that the act of the legislature authorizing the governor to appoint persons to fill the places of judges of this Court temporarily absent or incapacitated, is unconstitutional; and the appointment of the respondent is therefore void.

Justice ANDERSON. In this case, Solomon Heydenfeldt, a justice of this Court, applied to the legislature for leave of absence, to visit the Atlantic States. It was granted for six months, by a joint resolution. Judge Heydenfeldt left the State on or about the first day of March. On the 27th of March, the legislature passed an act to supply the temporary vacancy caused by the absence of a Judge of the Supreme Court, &c. That act is in the following words. (His Honor read the act set out in the agreed case.) Under the authority of this act, the governor appointed Alexander Wells a Justice of this Court, to supply the temporary vacancy caused by the absence of Judge Heydenfeldt. At this time, the requisite oath was administered to Judge Wells, and he took his seat upon this bench. He sat several days at the hearing of causes before the

Court. Some doubts having been expressed as to the constitutionality of his appointment, an agreed case was made, and a judgment *pro forma* of the District Court in favour of the respondent, upon a *quo warranto:* and the question intended to be presented is, Whether his appointment as a justice of this Court is constitutional? In the examination of this question, I shall waive, for the present, any remarks upon this mode of proceeding. The question proposed is a very grave and important one. It affects very great public interests, and involves principles of the first magnitude, as to *the constitutional powers of the government.* It is, however, so far novel as being the first of the kind brought forward for judicial investigation in this form, within my knowledge, in regard to a Supreme Justice in his own tribunal. Considerations connecting themselves with the peculiar state of the case will necessarily have a place in the progress of my examination of the subject. As they must form no small, and perhaps the most important part of what I have to say, in their relation to the constitutional question involved, it will be appropriate to postpone them to the close of my discussion; and in the meantime, I will dispose of the antecedents that belong to the inquiry before me, and which also are of the highest consequence. They equally affect the Constitution, but are of a different class.

I will take this occasion to say, that it was hardly to be expected that in our new country, we should be able to put our government into practical operation without being pressed and disturbed by such exciting topics, although they may but embrace principles which have been already wisely disposed of in older States, where discipline of thought and care of patriotism are equal to the best and the highest to be found among the most enlightened people. Perhaps it is well that we should have some of these difficulties. If they give a right direction to the professional and public mind, it may leave no cause of regret. I consider this far the most important question that has ever been before this Court; and I must therefore take occasion to note our own position. It is a mistake of what this is, which sometimes leads us into irretrievable error. The usual office of the judiciary is that of holding the scales of justice, and with a delicate, firm, and equal hand, balancing the rights and wrongs

of our fellow-men.   Our guides and authorities for that duty are,
as they ought to be, admirably adapted to the minutest as well
as the greatest interests, and the most difficult inquiries.   The
rules for our proceedings are old, well defined, known, and ac-
knowledged by the learned; and whether technical or common,
simple or complicated, have a certain and unvarying application.
In their use we work under the light of a science of centuries.
Such is the character of our ordinary duties, and such are our
aids.

When, however, we take our position upon constitutional
ground, our attitude and relations are very different.  By the
common consent of the enlightened men of all pursuits, by the
authority of the learned, and the men of thought and knowledge
of the legal profession, by the example of like tribunals in equal
circumstances, by the necessity of the occasion, the magnitude
of the interests involved, and by all that we have to do, as be-
tween the co-ordinate branches of the government, our attention
and judgment are directed to a new state of things, far greater
results, higher aims, and wider consequences.   In this position,
different rules do and must govern us.   We lay aside the rigid
technicalities of the law, and investigate the theory and philoso-
phy of a whole government, and the object of its creation.   We
seek to adjust a perfect concordance in all its parts, to give
effect to each, without allowing encroachments upon, or the de-
struction of any other.   With us, the authority of those who
have preceded us in the initiative of putting the constitution into
operation, and thereby giving to it a cotemporaneous and practi-
cal exposition, should have great weight.   We are bound always
to find that the framers of a constitution meant nothing impos-
sible or absurd, and that the system of its co-ordinate branches
has harmony and co-operation.   And above all, we must proceed
under the solemn admonition, that the judiciary is but one of the
departments of the government, having its sphere of power and
action cautiously defined.   In this connexion, I am brought to
the notice which was taken, in the course of the very able argu-
ments by the counsel, of the relations of the judiciary to the
legislature and the executive.   Under our constitution, the true
state of the judiciary is that of perfect independence, in the
exercise of its legitimate powers.   It is free from restraint, and

possesses an untrammeled discretion; but without the right of invading the functions of its co-ordinate branches. Its tenure of office is fixed, and not changeable by law. Its responsibilities are founded, where they should be, upon its conduct. Its triers are pointed out by the Constitution; and no others can usurp that right. So much for the persons and offices of the judges. That which affects the tribunal of the Supreme Court especially, in the progress of its history, as it concerns the incidents by which its existence in form and numbers as begun, is to be maintained, is divided between the people, the legislature, and the executive. The former make the elections to fill the terms from the 1st of January, after they are vacated by death, resignation, or limitation. The legislature have the sole control over all the incidents of temporary vacancy, so far as to prescribe the rules affecting it. They have also the power to define what shall be judicial misdemeanors, and may add to those classes which are *mala in se*, whatever they may find it necessary, just and reasonable, and suited to the nature of things, and the insurance of the discharge of public duties, to make *mala prohibita*. By this I do not mean an arbitrary license. But they may enlarge the legal definition of the term misdemeanor, as used in the constitution, so as to declare that a particular neglect of duty, or a wilful and perverse absence, shall be deemed and construed to be within its judicial meaning. The executive possesses the power of filling vacancies *ad interim*, between their occurrence and the accession of the newly elected incumbent, on the first of January thereafter. This power applies to whatever may be the manner or circumstances of the vacancy. That is under the control of the legislature. Such are the relations of the judiciary, and such its position. They are founded in reason. The first leading objection made by the learned attorney-general to the constitutionality of the appointment of Judge Wells was, that it would create four judges. This question at first, upon the face of it, and without being tested by investigation, has almost the appearance of a legal barrier; but it is really the least difficult. It is made difficult only by mistaking its import, and involving the argument. There is but one Chief Magistrate; and yet the Constitution expressly provides that in his absence, his *functions* shall be supplied by the accession of another; because the effect

of that absence is to *suspend his functions.* In the general grant of powers, express or implied, the one being incidental to the other, and necessary to enable the legislature and executive to provide for and fill vacancies, occurring from any cause, this same accession of another to the *suspended functions* of a judge, was contemplated. In this we find the true distinction founded upon a difference existing in the nature of things, between a *vested right of tenure in the term of an office,* and the *functions* of the office. The vested right of tenure for the term, carries with it the privilege of enjoying certain emoluments. This vests solely that personal right, which only determines the power of exercising the functions of the office, under particular qualifications of time and place. By the wise policy of our ancestors, *time and place* were made essential constituents of their Courts. We have imitated their example in all the States of this Union. So our Constitution has established the same rule; and by law, our Supreme Judges are required to reside in the State. During that residence, the vested right in the tenure of the office of Supreme Justice, is determinative of its *functions.* While that residence continues, they attach by reason of that vested right. But the moment the judge passes beyond the territorial line, they cease to exist. Anywhere within the State, he has certain prescribed functions. Upon the bench, at the legal *time and place,* the *full functions* of Supreme Justice attach. But when he absents himself from the State, his *vested right of tenure in the term of the office* is distinct from that, and is not parted from by him, but attaches to his person. It goes with him, and keeps with him. The *functions* of the office are left behind, and cannot be taken out of the State. They become temporarily vacant. It is the fault of disregarding this obvious distinction which causes so much doubt. Another, therefore, may, being duly appointed, *ad interim,* exercise within the State those *functions,* subject to the accession of the annual election and term, if the vacancy in the meantime becomes absolute. Otherwise, the functions of judge would be inert and unoccupied. What the Constitution, therefore, contemplated by three judges, was that of three persons within the State, and seated upon the bench, exercising the judicial functions. Whenever the person holding

the tenure of the term returns to the State, he takes his position, and is, *de jure* and *de facto*, the judge, in the full exercise of all his powers; and the person heretofore administering the functions temporarily, by that constitutional accession, ceases to be judge. His authority is exhausted, and his rights ended. So there would thus have been but three judges exercising the judicial functions at one time. In the language of the Constitution, "the Supreme *Court consists* of a chief justice, and two associate justices," discharging their functions all the time. It is *"the Court"* which is so made to consist. To be so, it must have the constituent elements of *judges*, of *time*, and of *place*. The judge who is absent from the State is not one of *that Court*. Each member is in the full exercise of his functions. In his absence, he can make no part of *the unity of the elements of time and place*. In England, the judge takes no functions with him out of the realm, or if he pass from one portion of the United Kingdom to another, out of his locality, so as to disturb the right of substitution in the crown, if it be essential to the administration of justice. In the case put by the learned counsel, as to the contemplated absence of the President of the United States on a visit to Europe, we have the precise constitutional question. He would have left the *functions* of president behind him, and another would have filled them. The functions of the office were created for the benefit of the country, and are local to it,—with or without legislation. The vested right of the tenure for the term of his election would have attached to his person; and at his return, his accession to its functions would have followed. This would in no wise have depended upon the fact whether he had done right or wrong. Of this his constitutional triers would judge, and no others could. As to the further explanation of all this, we find it enforced within sixty days after the organization of the government, by the act passed by the legislature on the 14th of February, 1850. The convention was then fresh in the minds of men. That body was composed of many of those who were members of it. In the 2d section are the words,—referring to the Supreme Court,—"The said justices shall reside in the State." The legislature had the constitutional right to regulate this, and I need not stop to prove it. It is essentially incident to the exercise of the judicial (legislative?) functions. This I

take to be the true distinction in relation to the number of judges, and the proper interpretation. It is alike supported by reason, common sense, the cotemporaneous and practical exposition of the respective departments of the government, and conformable to the history of every State of the Union, and the early established doctrine in regard to the Supreme Judiciary of the United States. In the progress of this inquiry, through the entire range of the subject, I think we shall find these positions more fully borne out and demonstrated, as being a part of the whole system of construction, having perfect harmony and ample strength, to sustain the Constitution as a practical and consistent theory of government, in these particulars, so far as it regulates the co-ordinate departments, and especially the Supreme Judiciary.

Intimately interwoven with the preceding discussion is, *what* interpretation should be put upon the word *vacancy*, as used in the 8th section of the 5th article of the Constitution. Any interpretation of the word vacancy which would explain it as referring exclusively to the permanent removal from office for impeachment, or by reason of death, resignation, or limitation, could not be applicable to the 8th section of the 5th article, because it would make nonsense of the sentence, the Constitution absurd, and work the destruction of one co-ordinate branch of the government, without strengthening any other. The whole frame would fall, because the laws passed by the legislature might be suspended for an indefinite period, for the want of the existence of a judicial power to administer them. Besides, one of the leading powers of the executive would be nullified, because he would be unable, as required at his hands, to keep the judicial functions in action, and thereby indirectly, but certainly, in that respect, he would fail to see that the laws are faithfully executed. Upon the very principle that the acts of parliament which are impossible to be performed are of no validity, we can put no construction upon any part of the Constitution which would make it absurd, and of no effect; for we know it was not so intended, but that it must be made operative, and the several parts to agree as a whole. So, the rule that one part of a statute must be so construed by another that the whole may stand,—"*ut res magis valeat quam pereat*,"—is applicable, in a stronger and

more enlarged sense, to a Constitution which plans a system of government. More particularly is this applicable when the very existence of one of its co-ordinate departments depends upon the force and extent of the rule. We must proceed with this inquiry, remembering that *vacancy* is not a technical word, nor one of art. It has, obviously, two meanings. One, which the select few might, after the teachings of a professional education, under certain relations and circumstances, understand in a limited and restrained sense, having regard to its occasional statutory use, and the original of its derivation. But even this would be held subsidiary to other causes, they being equal. However, its most learned sense would relieve it from the rigour with which it is sought to be constrained here. For example, one of the explanations of its Latin original, (verb,) is, "to have nothing to do." This would agree with the doctrine of *the suspended functions* of a judge. That other meaning to which I refer, is that which is general and popular. This was the most probable source from whence it was taken. The members of the convention came direct from the people, and performed, doubtless, their work after the order of their usual modes of thought, and which was shaped in its expression by words of popular and general use. To the popular mind, this would be a *temporary vacancy*, and the popular tongue would have no other name for it. What else would they call it? To the public mind, the absence of an officer from the Sate, leaves the office vacant; and the public will always speak of it as a temporary vacancy. Taking this as the true interpretation of the word, we can have no difficulty in defining the object of the 8th section of the 5th article. It agrees with the purpose of the 2nd section of the 6th article; and will keep, under a due administration of its provisions, three judges always in the exercise of the *functions* of the Supreme Court. Without that, however, it must be liable to repeated interruptions, highly prejudicial to the public interests, and may become wholly inert in all its functions at any time, upon the happening of particular contingencies, and without remedy, for an indefinite period, except by the exercise of the powers of the other co-ordinate branches, as I have pointed out. It could never be the intention of the convention to construct a system which could not be administered; and therefore we are warranted

by the authority of every rule of interpretation, to take the meaning of this word to be such as will not mar the sense of the Constitution, nor endanger the practical workings of the government. This was doubtless meant by the makers of that instrument. But we pass from this whole train of induction to fact, and authority which will not be questioned, and which, I think, unanswerably settles this part of the controversy, and in such manner as, taken with the reading of the 8th section of the 5th article, and the whole context of the Constitution, augments the strength of every argument, and the long range of practical exposition, which we cannot disregard, and which it is safer to follow than to resist. The authority to which I refer, is in the Constitution itself. It is in the same article with the word under consideration. It proves that the framers of the Constitution did not postpone to the legislature, nor to the judiciary, nor to the learned gentlemen of the legal profession, the task and responsibility of interpreting the word *vacancy*. They have done it themselves. I have tried, by a process of reasoning, guided by legal signs, to make the nearest approaches I could to the truth as it is; but knowing the value of being right in the decisions of the highest judicial tribunal, and the inferiority of all other standards, I concede to the special treatment of this word by the makers of the Constitution. It is a singular fact, and being so, proper to be noted, that the word vacancy, is only used four times in the Constitution, and solely within the 5th article. Each time, also, it is used in the same sense. The additional instances to which I refer, have a clear, expressed, and unmistakeable meaning. If I were to say that the learned counsel in this case had examined it with great ability, and that their arguments had materially aided my investigations, the words "ability" and "aided," would have no more definite and intelligible meaning, than the word *vacancy* has as there used. It is fully explanatory of what is meant by the same word in the 8th section. The word is used to signify a *temporary vacancy*,—and so expresses it. The latter clause of the 16th section of the 5th article, makes provision for the vacancy of the office of Lieutenant-Governor. It sums up *all causes of vacancy*, and whether *permanent or temporary*, classes them under that head, and by that single *word*. The recital of the language, will enforce what I

state. I repeat the clause: "If, during a vacancy of the office of Governor, the Lieutenant-Governor shall be impeached, displaced, resign, die, *or become incapable of performing the duties of his office,* or be *absent from the State,* the president of the Senate shall act as Governor, until the *vacancy* be filled, *or the disability shall cease.*" Here the word *vacancy* is used both in a *permanent and temporary* sense. It may be absolute, or becomes contingent upon the determination of the disability. It is previously provided that there shall be a Lieutenant-Governor elected at the same time and place, and in the same manner as the Governor; and only *one Lieutenant-Governor,* as there are only *three judges.* But he may become *incapable* of performing his duties, or be *absent,* and so be under disability; and during this time, *another shall take his place.* When, however, that disability ceases, he re-takes his place; and from whence does he come? From that temporary vacancy. He was *living,* but out of his *functions;* either incapable or absent, and therefore disabled from the performance of his duties. It would have been absurd to have created that, or any other office, not subject to a temporary vacancy. That would have been the excess and folly of reverence and staid respect for the man, without the consideration for the public interests, to be found in the utility and necessity of *the functions* of the office. This train of incidents and reasonings runs through all the Constitution in relation to offices, their number, how to be occupied, how determined, and by what methods the functions shall always be kept in action. Thus the Constitution sustains the only practicable doctrine, as laid down, that *the vested right of the tenure of the term* attaches to the person of the elected incumbent, but that the *functions* of the office, in certain contingencies, separate from him temporarily, and adhere to a distinct class of powers within its department, for the use, benefit, and protection of that great public, for which the government was created. Thus, also, the Constitution has established the interpretation of the word *vacancy* to be, as used in it, that it means either *permanent or temporary.* The cause and the reason go together. The absence or incapacity of performance, produces the disability; the vacancy of the functions, for so long, follows; when the former ends, the latter are resumed by the original incumbent. For all this, the Constitution has used

the word *vacancy*.. There it stands.   There is no getting around it.   It is the only truth;—the solid and impregnable ground of the Constitution, not incidentally formed, but constructed for a particular purpose, with premeditation, thought, wisdom, and that good practical common sense which the objects and the occasion demanded.   But I am not done with the support even in this very place of the Constitution; and although I do not think it necessary, I hold it to be my duty to add every rivet which may make the work more secure.   The 17th, being the next section after that I have already quoted, declares that, " In case of the impeachment of the governor, or his removal from office, death, inability to discharge the powers and duties of the said office, resignation, or absence from the State, the powers and duties of the office shall devolve upon the lieutenant-governor for the residue of the term, or until the disability shall cease."   There are two things which this still further demonstrates.   First, that the Constitution never lost sight of the proposition that a temporary vacancy might occur in *the functions* of an office, while *the tenure of it was held by the stated incumbent ;* that in such event, another might fill it; and that when the disability ceased, the former should resume his constitutional functions.   Can any thing be plainer than this?   Second, that the first section provides there shall be but *one governor,* as there should be only *three judges* of the Supreme Court; but the section under consideration contemplates certain contingencies which may cause a *temporary vacancy* of the functions of his office; and though he be living, and holding *the tenure* of the term, another may occupy and administer *the functions.*   Thus the same idea is maintained throughout the Constitution, as applied to the very highest officer known to it.   The mistake committed, usually, in forming an opinion upon this subject, consists, as I have stated, in not drawing the proper distinction between the tenure of the term, which attaches to the person of the incumbent, and the functions of the office, which, under certain circumstances, he may exercise, but which belongs to the sphere of a department, for the right as well as the good of the people.   From that sphere they cannot be separated.   The Constitution, we find, makes that distinction. The law makes it.   The policy of all governments has made it. The usages of all civilized nations have incorporated it.   We

have given to it practical effect. Shall we halt now, and with a
violent hand derange all this? A single view more at this con-
junction will add to the strength of the argument. In looking
into the latter clause of the 16th section, we will perceive that
the enumeration of the causes of vacancy, for the particular office
referred to, is so complete that it is susceptible of a construc-
tion which *which will cover every possible contingency*, whether
permanent or temporary. In all this, there has been a perfect
consistency, which pervades the instrument upon that class of
subjects. It follows out the first embodiment of the same policy
which was engrafted into the 8th section, showing a continuous
concert in the framers of the Constitution, to provide for the
happening of all events whatever affecting the exercise of *the
functions* of any office. The recital of the 8th section will make
this obvious. Thus: " Where any office shall, *from any cause*,
become vacant, and no mode is provided by the Constitution and
laws for filling such vacancy, the Governor shall have power to
fill such vacancy by granting a commission, which shall expire
at the end of the next session of the legislature," &c. Here the
terms " from any cause" are equally full and comprehensive,
embracing *all contingencies whatever*. The term *vacancy* as
used here, is declared in the same article, in the 16th section, to
be applied to *temporary* and to *permanent* causes. The repeated
introduction of it throughout that article of the Constitution, and
its omission to be used in any other sense, and in any other part,
present it, *mutatis mutandis*, in all its relations, retaining the
same signification. The conclusion seems to me to be irresis-
tible. But another illustration enforces this. In order to bear
along the argument in all its truth and force, let us suppose that
two of the judges of the Supreme Court have been stricken down
with sickness by the hand of God, and remain so for twelve
months, or any longer time. The highest fountain of justice is
dried up. The great interests of society, in their multifarious
accumulations of rights and wrongs, to be protected or redressed,
halt at the threshold. *The cause* is not included in that which
is expressed in the Constitution. *It is no misdemeanor.* Else-
where it has been provided that *the functions* of the highest officer
in the State may be vacated temporarily by such incapacity.
And this has been, *in hæc verba*, denominated, in the 16th sec-

tion, to be a *vacancy*. But according to the opposing theory in this case, it cannot be: first, because it is not an expressed cause of removal: and second, because it is not a vacancy. Wise or unwise, by that interpretation, so it is. So they would have it to stand in the Constitution. It is irremediable. The government must fail. It breaks down. In the forcible language of the counsel who so ably closed this case on the part of Judge Wells, it is self-destructive. Such illustrations might be multiplied. But we may reasonably pause to inquire, was this intended? Is it a matter of so little importance as to have been neglected, forgotten, or designedly omitted? I think not. We turn from expressed causes for permanent removal to that 8th section, and find that a vacancy from any cause may be supplied by a commission from the Governor; and in the 16th section of the same article, we find the word vacancy interpreted by the framers of the Constitution, to mean that which is *temporary* or *permanent*. Here, then, is a relief from this dilemma, and every other like it; and the Constitution, frail as it may be in many respects, is perfect and remedial in this. In relation to this branch of the subject, I will add but one single other reading of the 8th section. If therein it had been intended to leave the question of vacancy to be determined only by permanent removal from office, by impeachment, or death, or resignation, or limitation, solely, those words, "from any cause," and the "mode," &c., were useless and absurd. Without them, the power of appointment would have been vested in the executive by the remaining language. I will read the section without those words, and their incidental clause, and see how plain the whole analysis appears. The section would then be as follows: "When any office shall become vacant, the governor shall have power to fill such vacancy, by granting a commission," &c. Thus, the simple power to fill such vacancy, according to the opposing mode of interpretation, for a permanent removal, would have been complete. But the framers of the Constitution meant more than this. They designed to cover the whole ground of vacancy, and therefore they said, "When any office, *from any cause*, becomes vacant, and *no mode is provided by the Constitution and laws for filling such vacancy*, the governor shall have power to fill such vacancy by granting a commission," &c. And

so end these readings, completely demonstrating, as I think, the efficiency and consistency of the Constitution upon this subject.

From this part of the subject, I pass to the examination of the contemporaneous and practical exposition of it, as found in our own history, in that of the United States, and of the States of this Union. I shall follow the order, and very briefly consider the more important positions, which were so ably discussed by the learned counsel of Judge Wells. It was maintained, that contemporaneous legislative exposition and judicial acquiescence support the constitutionality of legislative acts; and that other States with constitutions similar to ours had passed similar laws; that no decision can be adduced declaring a law like the one in question to be unconstitutional; that the judiciary will not decide by implication that a State legislature has transcended its powers, when the act in question is not *directly* in conflict with the *restraints* of the Constitution. To sustain these views, reference was made to 5 Louisiana Annual Reports, p. 758. This case turned upon the constitutionality of a law made by the legislature of Louisiana, under their implied or incidental power to pass such laws as would give effect to the judicial powers specifically vested by the Constitution. A Judge of the Fifth Judicial District had refused to comply with an act, under which he was officially notified to attend and try certain causes, at a particular time and place, because of the recusancy of another Judge, on account of his previous professional connexion with them. The petitioners asked for a rule upon the Judge of the Fifth District to show cause why a *mandamus* should not issue, commanding him to hold a session of the District Court for the Parish of Ascension, for the trial of said suits. He returned for answer his reasons for refusing. It was contended in that case, that the statute requiring the District Judges to try such causes, out of their respective Districts, was in conflict with the Constitution. The Supreme Court, upon the hearing of the case, made the rule absolute. Chief Justice Eustis said, " That it had always been held that presumption must always be in favour of the validity of laws, and that no law ought to be held unconstitutional, and consequently void and of no effect, unless its opposition to the Constitution be clear, and free from doubt; that in that case, it was not clearly and directly in conflict with any article of the Con-

stitution, but so presumed to be exclusively by implication; that at the first session of the legislature which assembled under the Constitution, (of 1845,) upon whom the duty devolved of carrying into effect its provisions, they undertook by statute to give full effect to the judicial power." He also said, that " They considered that the power must be exercised with reference to those great principles of common right upon which the government is based, and upon which the security of society itself depends; and that the statute under consideration was a necessary and proper mode of giving effect to the judicial powers vested by the Constitution." The decision in this case goes to two points, which are material in the question before us. First, that an act cannot by implication be considered a violation of the Constitution; but to be so, must be in direct conflict with it. Second, that a contemporaneous exposition of the Constitution, by the passage of a necessary and proper law to give effect to the judicial powers actually vested, in the absence alike of a specific grant of power to the legislature, and of restrictions to prevent its exercise, is of such constitutional authority as to be held good. There is also great force in the point made, that no decision can be adduced declaring a law like the one in question unconstitutional. In the absence of such a fact, the authority of contemporaneous exposition is conclusive. The policy of maintaining implied and incidental powers of legislation, under every constitution, with a view to carry out other vested powers clearly defined, may be taken as the settled practice and doctrine of the respective States, and as inseparable from the faithful execution of organic laws. With us are to be found both contemporaneous exposition and practical exposition of the Constitution, beginning with the first legislature, within sixty days after its ratification by the people, and coming down to the present time. At the first session, the legislature provided for the organization of the judiciary; for the election of the Supreme Justices; for their residence in the State; for vacancies in their offices, and how supplied; for disqualification in particular cases, and the remedy. They also regulated their absence; and granted leave of absence in certain cases; and made many other provisions, certainly under no expressed powers in the Constitution. Those acts have been recognized and acquiesced in by this Court; and both the other

co-ordinate branches of the government have continued to respect them. The practice also of appointing special judges has been resorted to in several of the States, as well as here; and the same general legislation has been pursued in every State, upon the adoption of a new Constitution, founded upon the theory of exercising powers which were incidental, and necessary to carry out other specifically vested powers. There is, probably, upon the subject of practical exposition, no higher authority than that referred to by the learned counsel, in the history of the government of the United States. There are various causes why this theory, as begun then, is entitled to great weight and respect. The government went into operation, as to political influence, if not in numbers, in the hands at least of the enlightened men who made the Constitution: (Mr. Madison was in it, as he was of the Convention:) and very early, with the first movements of the new administration, the theory was assumed by the several departments of the government as to the mode of construing the Constitution. As to the judiciary, I do not recollect that the history of the day informs us that any unreconciled difference of views existed among the jurists and statesmen who were actors on the occasion. Beyond this line it is not necessary to go. Whatever there might have been of politics, it does not affect our judicial inquiries. But we are led to the example of what was (and has been) the practical exposition of the Constitution of the United States, in certain relations, which have established the principle we are considering. Upon the subject of practical exposition, reference was made to 1 Cranch, p. 299, (a case in the Supreme Court of the United States.) In that case, it was contended that the reversal of the judgment below ought to be made; because "The judges of the Supreme Court had no right to sit as circuit judges, not being appointed for that purpose, and that they ought to have distinct commissions." The Court said. "To this objection, which is of recent date, it is sufficient to observe, that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the Constitution. It is a cotemporary interpretation of a most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled. Of course the question is at rest, and ought not

now to be disturbed." The learned counsel who closed this case for the respondent went through the several points in the early incidents of the practical exposition of the Constitution of the United States, including the various matters in regard to this particular case. The particulars of the Vice Presidency of the United States were referred to, as occurring prior to the amendments to the Constitution. Story's Abr. 542. 761; 1 Kent, 301, and 3 Ib. 297–8, were referred to. It is true this case is equally curious and striking; and the authorities relied upon show how strong are the considerations of necessity to enforce the initiative of a practical exposition, and also how high is the standard of that construction when it once obtains,—ranking with the Constitution itself. Practical exposition and cotemporaneous exposition may be distinct; but when united upon the same subject, as they are in this instance, cannot be resisted. And finally, within this survey of the case, the authorities I find are very full and satisfactory, in relation to the appointment of special judges: and until human government becomes more perfect, and human forecast far greater, the authority of practical exposition, and all the political and judicial relations which pass with it and form a part of it, will have to receive a consideration at least so liberal and respectful, that the imperfect constitutions which it is intended to interpret can be made equal to the wants and objects for which they were created. A volume might be written upon this line of cotemporaneous and practical exposition, following the remarks of the respective counsel. In this part of the subject, my only labour has been to select the points. I have omitted many of the authorities referred to for the purpose of saving time. They are equally full and clear; and in looking at the past through them, it has seemed to me like an illuminated path, a track of light; and I think we shall lose nothing of the strength of our reasons and authorities by allowing it to guide us, as it has done our fathers.

I have postponed to the last that which I believe to be of the highest import, in the novel circumstances in which we are placed. I allude to the question of the powers of this Court, and what follows in relation to the rights of Judge Wells, and of those of the co-ordinate departments of the government. The powers of this government are divided into three separate departments. The

language of the Constitution, in the 3d article, is; "The powers
of the government of.the State of California shall be divided into
three separate departments: the legislative, executive, and judi-
cial; and no person charged with the exercise of powers properly
belonging to one of those departments, shall exercise any func-
tions appertaining to either of the others, except in the cases
hereinafter expressly directed or permitted." This was intended
to preserve the balance of power, and prevent the invasion of
the rights of one department by another; and also to restrict
each within its prescribed limits. The article stands out in the
Constitution in bold relief, unencumbered by one solitary other
provision. It so marks the sense of the importance attached to
it by the makers. The powers of this Court are purely appel-
late; and they are limited within a particular sphere. The ap-
pellate powers are, "In all cases where the matter in dispute
exceeds two hundred dollars, where the legality of any tax, toll,
or import, or municipal fine is in question, and in all criminal
cases amounting to felony on questions of law alone." The
Supreme Justices have power to issue all writs and process neces-
sary to the exercise of their appellate jurisdiction; and "shall be
conservators of the peace throughout the State." They have the
power of the writ of *habeas corpus.* As to all else, they are re-
strained in the most explicit terms. The sphere of their powers
hath this extent, and no more. Beyond, it would be a violation of
that of others; (unless it is what remains with the people.) The
powers of those other co-ordinate departments are either express, or
implied, as growing out of the first. Here we have a platform to
stand upon. This Court, it is true, has very great powers; and
ought to have; and they should not be diminished by any con-
strained construction. But the case under consideration does not
belong within the class of our powers. It is expressly given to others,
and marks the line of distinction between the other departments
and this. We have no power over our own election,—none to
count the votes, or determine the result. Nor have we the
power of removal of one of our number for any cause whatever,
except he first fall under the judgment of others. We cannot
try the Governor's election, nor the election of any member of
the legislature. We cannot try either for any misdemeanor in
office. *Their judges are appointed. So are ours.* In this case,

we have neither express nor implied power. It is at the border, at the line of demarcation, which separates and distinguishes the powers of the three great departments. The only mode in which a judge can be removed, is by impeachment. The 18th section of the 4th article declares, that "The Assembly shall have the sole power of impeachment;—and all impeachments shall be tried by the Senate." The 19th section says, "The Justices of the Supreme Court shall be liable to impeachment for any misdemeanor in office; and judgment shall extend to removal from office, and disqualification to hold any office of honour, trust, or profit, under the State." We can, under no possible state of circumstances, be the triers of Supreme Justices. We have no power to deprive them of the tenure of their term, or of their right to exercise the functions of their office. The moment we do, we pass out of the limits of our sphere. Judge Wells is here as we are here; with a commission of equal dignity with ours. Upon a *quo warranto* it is proposed to remove him from office—to make null and void his commission; which proceeds from one of the co-ordinate departments of the government, and by virtue of authority from another. From what part of the Constitution do we derive the right to try a Justice of the Supreme Court for his office? Judge Wells has already taken the oath prescribed by the Constitution, and occupied his seat upon the bench, and sat at the hearing of several causes, for successive days. He is a Judge of this Court. We possess no inherent power of removal. All the powers we have are derivative. Even that of the power of attachment, has been limited. It is, therefore, not within the scope of our duties or our privileges, to interfere with the office of Judge Wells. To do this, we should assume the office of the Assembly to arraign, of the Senate to adjudicate, as well also, that of the functions of the executive to determine when a vacancy has occurred, and whether it shall be filled. If this would not be an advanced step to the usurpation of all the powers of the government concentrated in one source, and utterly disregarding all co-ordinate rights, I know not with what other class of cases, in a constitutional sense, it should be placed. The argument I draw from it is, that having no constitutional power ourselves to question or to remove Judge Wells, it follows that it can only be done by those who have the

constitutional power *expressly delegated to them.* The inclusion of the one, is the exclusion of the other. That power is in the legislature, who have already concurred in his appointment, by providing for it, and therefore pronouncing that it was constitutional. They were acting in their sphere, and providing for our continuous organization, which we have not ourselves the power to do. But to undo what they do, in this particular, would be an act of revolution, not of judicial power. If the co-ordinate branches are to respect the power of each other, no one of them must imply powers that never existed, never were intended, and never ought to exist. It is certain it is not one of our appellate powers, to appoint judges, or to remove them. Then the other co-ordinate departments are not invading ours, but are exercising a well-understood power, in providing for, and granting a commission to Judge Wells. Here our limits stop. All rights and wrongs beyond that, affecting this department, the Constitution has provided for. Last of all, should we violate the authority of both co-ordinate branches, in relation to the exercise of a power purposely put out of our reach? The difference of opinion should make us pause. If a mistake has been made, the remedy is left upon the legislature and the governor, in their official responsibility,—both to their triers; the one to the Senate, the other to the people. It is not sufficient for this occasion, because there is not a state of facts to sustain and to require it, to say that the Supreme Court has a right to protect itself,—to sustain its dignity, its integrity, its purity. It is a mere question of appointment,—not of contempt, or assault upon the tribunal, or the rights of the Court. The tendency of the act is exactly the contrary:—it is to preserve the Court; to prevent its dissolution, and insure an agreement in its decisions. This Court is bound to know, and does take notice judicially, of the absence of one of its members. It therefore knows that the functions of one of its members are not filled;—and equally bound to know that this appointment is to preserve it against the contingencies of dissolution. To advance the fiction that the Supreme Judiciary was in peril, is to advance the fiction that Judge Heydenfeldt is here in *propria persona;*—that there exists a judicial ubiquity; that the absent judge holding the term, was not *himself,* but that he was the *functions* of his office, which could not follow him out

of the State. By the law of the 14th of February, 1850, a judge appointed to this Court, may take the oath of office before any one entitled to administer oaths. He is not even bound to take the oath before this Court, or one of its justices. The question of danger to this Court, has nothing in it. Whenever it comes to that, the actual Constitutional remedies are ample, as long as the government itself can be maintained. We have no authority, under our general powers, which give us the· right to decide upon the constitutionality of a law, to exercise the power to remove a Justice of this Court from the possession of his functions. Our power and that power, however modified, are two distinct things. There are certain vested powers in the several departments, by the Constitution, which we cannot disturb by our decisions, no more *indirectly* than we can *directly.* If we could, under colour of our general powers to judge of the constitutionality of laws, and by the indirection of our decisions in that way, arrest the exercise of the particular constitutional prerogatives of the other departments, we might control the whole powers of the government, and thereby defeat the division of powers, as placed by the Constitution. That is not the philosophy of our government. It rests upon the separation of the great departments. The Constitution vindicates that separation, by providing remedies specifically declared, for any failures or violations of official duty by them respectively, in the exercise of certain powers. The power of administering those separate remedies, is not left exclusively in the hands of one department. They are divided. Our system, as are all systems of republican government, is complicated. It is the harmony and concert of movement in the several parts, and their non-disturbance of the rights and powers of each other, that can alone preserve it, give it the authority of popular sanction, the wisdom of select counsels, the certainty of judicial justice, and the promptitude and energy of executive action. The moment we disregard this philosophy of our organization, we have no guide to a correct interpretation of it. Without this, we have no lines of demarcation and separation between the powers. With it, all is safe. Without it, all will be conflict. I shall not, however, elaborate this branch of the question. I have felt it to be my duty to indicate some of the leading points of it. They have presented them-

selves to me in the progress of my investigations.  I state them, because I do not choose to leave myself subject to any future misinterpretation.  They embody no new theory.  It is one of profound interest, and for which there is great authority, as having the sanction of the wisest men, and being founded in the nature of our civil institutions.  Let us not, therefore, disregard the distinct spheres of the great departments of the government; but teach the doctrine, that when either is in danger of passing its limits, it should look cautiously, and rather concede something to its doubts, than advance to their extent.

My opinion is, that the law providing for the appointment of a Justice, in the absence of a Justice of this Court from the State, &c., is Constitutional; and that Judge Wells is now a Justice of this Court, constitutionally appointed, and has a right to take his seat here conformably to that, and by virtue of his commission; and that the *quo warranto* should be dismissed, and Judge Wells take his seat.

The statute (stats. 1851, p. 11,) provides that, "the concurrence of two Justices shall be necessary to pronounce a judgment."  Consequently, no judgment was rendered in this cause: and the Chief Justice remarked, that the respondent must exercise his own discretion, in resuming his seat.

---

Wednesday, May 5.   JUDGE WELLS took his seat on the bench.