[L. A. No. 9631. In Bank.—February 28, 1927.]

## HUGH FAY, Petitioner, v. THE DISTRICT COURT OF APPEAL, SECOND APPELLATE DISTRICT, DIVISION TWO, et al., Respondents.

[1] COURTS—JUDICIAL COUNCIL AMENDMENT—CONSTRUCTION.—It sufficiently appears from the body of the "Judicial Council Amendment" to the constitution (article VI, sections 1a, 6, 7, and 8), when read as a whole, that it was intended to have application to the entire judicial system of the state of California, including the Supreme Court and the several District Courts of Appeal; second, that it was intended to confer upon the judicial council certain powers such as are enumerated in subdivisions 1, 2, 3, 4, and 5 of section 1a of said amendment; and, third, that it was intended to confer upon the Chairman of the Judicial Council certain powers and duties having reference to whatever state of congestion he may find to exist in the calendars of the courts or judges of this state with a view to a speedy relief of such congestion, and "to expedite judicial business" by so doing.

[2] ID.—POWERS OF ASSIGNED JUDGES—CONSTRUCTION.—The phrase "to assist a court or judge whose calendar is congested," used in the "Judicial Council Amendment" to the constitution, because of its generality and absence of specific application and intendment, sheds but little light upon the proper interpretation to be given the particular provision of the constitution in which it is found, but the implication is clear from the subsequent provision of the amendment, which declares that the several judges thus assigned "to assist a court or judge whose calendar is congested" are to "sit and hold court as assigned," in other words, that said judges shall exercise judicial functions while operating under such assignment.

[3] ID.—ASSIGNMENT OF JUDGES—ACTING AS PART OF COURT.—Judges assigned to assist a court or judge whose calendar is congested, under the "Judicial Council Amendment" to the constitution, exercise their judicial functions under such appointment in the tribunal as constituted by the constitution.

[4] ID. — STATUTORY CONSTRUCTION. — In interpreting the "Judicial Council Amendment" to the constitution, it should be treated as a whole and considered in the light of previous interpretations of the provisions of article VI of the constitution, which it purports to amend; and it should be construed in the light of whatever evils or defects in the administration of justice it is found to have been designed to remedy.

[5] Id.—Change in Law—Intent.—Whatever may have been the intent of the proponent of a particular change in a law must at the last analysis be derived from the language of the proposed enactment purporting to make such change.

[6] Id.—Repeals by Implication.—Rule.—Repeals by implication are not favored and are recognized only when there is an irreconcilable conflict between two or more legislative enactments.

[7] Id.—Express Repeal or Modification.—When in any enactment there appears an express modification or repeal of certain provisions in a former enactment, such express modification or repeal of the portions thus affected will be held to disclose the full intent of the framers of the later enactment as to how much or what portion of the former it was intended to modify or repeal.

[8] Id.—Construction of Section 6 of Judicial Council Amendment.—By the terms of section 6 of the "Judicial Council Amendment" to the constitution, the previously existing provisions of the constitution respecting Superior Courts are expressly modified and to that extent repealed in so far as these related to the number of superior judges who might function in said court in the several counties of California.

[9] Id.—Assignment of Judges—Number—Power of Chairman of Judicial Council.—The express provisions of section 6 of the "Judicial Council Amendment" to the constitution, read in connection with the language of section 1a of said amendment, renders fully applicable the rules forbidding repeals by implication.

[10] Id.—Power of Chairman of Judicial Council.—The power with which the Chairman of the Judicial Council is invested, by the "Judicial Council Amendment" to the constitution, is that of assigning judges or justices "to assist" the Supreme Court and the several District Courts of Appeal, as these courts were theretofore constituted under the terms of the constitution prior to said amendment, whenever the calendars of said tribunals have become congested.

[11] Id.—Status of Assigned Judges.—In making the assignment of any justice or judge or of any number of them "to assist" the appellate tribunals, the Chairman of the Judicial Council was empowered to invest the persons so selected and assigned with no other or different official relation to such courts than that held by the already regularly constituted members thereof, which

5. See 23 Cal. Jur. 726; 25 R. C. L. 961.
6. See 23 Cal. Jur. 694; 25 R. C. L. 918.
7. See 23 Cal. Jur. 712.

was merely that of blending into the group constituency thereof in order, in that relation, to exercise the judicial function.

[12] ID.—JUDGES PRO TEMPORE—CONSTRUCTION OF CONSTITUTION.—Under the "Judicial Council Amendment" of the constitution, it was not only the intention to retain the former constitutional provisions relating to the appointment of justices *pro tempore,* but to so broaden the former provisions as to authorize the selection of justices or judges *pro tempore* to assist the Supreme Court and District Courts of Appeal when their calendars were congested, although the regularly constituted justices of said courts who were thus, for the purpose of hearing particular causes or calendars, replaced were neither disqualified nor unable to act.

[13] ID.—STATUTORY CONSTRUCTION.—Between two apparently conflicting interpretations of a law equally adaptable, that one is to be preferred which will give effect to the entire language thereof, rather than that which would destroy any portion of it and to that extent defeat the legislative intent.

[14] ID.—ORDER ASSIGNING JUDGES—CONSTRUCTION OF.—An order made by the Chief Justice of the Supreme Court, acting *ex officio* as chairman of the Judicial Council, assigning certain Superior Court judges to assist a District Court of Appeal, if construed to refer to these judges in their individual relation to said court, is a proper exercise of power under the "Judicial Council Amendment" to the constitution.

[15] ID.—ORDER OF DISTRICT COURT OF APPEAL.—An order of the District Court of Appeal which in effect authorizes three Superior Court judges, assigned by the Chairman of the Judicial Council to said court to assist it, as a group, to sit as a court, and not to sit and act in that individual relationship to said court which each of them would otherwise have occupied as justices *pro tempore* under the terms of the constitution before the "Judicial Council Amendment," is invalid.

---

(1) 15 **C. J.**, p. 856, n. 17, p. 858, n. 55 New. (2) 33 **C. J.**, p. 978, n. 84, p. 979, n. 94. (3) 15 **C. J.**, p. 857, n. 46. (4) 12 **C. J.**, p. 703, n. 97, p. 707, n. 35, p. 710, n. 62; 36 **Cyc.**, p. 1115, n. 2, p. 1128, n. 54, p. 1137, n. 43. (5) 36 **Cyc.**, p. 1069, n. 14. (6) 36 **Cyc.**, p. 1071, n. 25, p. 1072, n. 28, p. 1073, n. 35. (7) 36 **Cyc.**, p. 1069, n. 15. (8) 15 **C. J.**, p. 858, n. 55 New. (9) 15 **C. J.**, p. 858, n. 55 New. (10) 15 **C. J.**, p. 889, n. 38. (11) 15 **C. J.**, p. 893, n. 97. (12) 33 **C. J.**, p. 1024, n. 95, p. 1032, n. 95. (13) 36 **Cyc.**, p. 1128, n. 58, p. 1129, n. 59, p. 1130, n. 61. (14) 33 **C. J.**, p. 1030, n. 34, 35, 41 New. (15) 33 **C. J.**, p. 1030, n. 36.

13. See 23 **Cal. Jur.** 757; 25 **R. C. L.** 999.

APPLICATION for a Writ of Certiorari to review an order of the District Court of Appeal designating certain judges of the Superior Court to assist such court sitting as a separate division thereof.    Order annulled.

The facts are stated in the opinion of the court.

Lyle Pendegast, Wm. J. Hunsaker, Daniel M. Hunsaker, F. M. Angellotti and Wm. B. Bosley, for Petitioner.

U. S. Webb, Attorney-General, and R. W. Harrison and John W. Maltman, Deputies Attorney-General, for Respondents.

R. P. Henshall, *Amicus Curiae,* for Petitioner.

John Perry Wood, Thos. C. Ridgway, Warren Olney, Jr., and Max Thelen, *Amici Curiae,* for Respondents.

RICHARDS, J.—The petitioner herein applies for a writ of review whereby he seeks to have reviewed a certain order made by the District Court of Appeal in and for the Second Appellate District, Division Two, purporting to direct that a certain cause pending upon appeal in said court entitled "The People etc., Plaintiff and Respondent, *vs.* Fay et al., Defendants and Appellants," be placed upon a calendar of said division of said court for hearing and argument upon a certain date before Honorable Harry R. Archbald, Honorable Elliot Craig and Honorable C. W. Guerin, Judges of the Superior Court of the State of California, in and for the County of Los Angeles, to whom said cause was by the terms of said order assigned for hearing, determination, and judgment. The foregoing order of said court purports to be predicated upon another certain order made by Honorable William H. Waste, Chief Justice of the Supreme Court of California, but purporting to act in making said order as chairman of the judicial council of the state of California, and which order reads as follows:

"In the Matter of the Assignment of Judges to Assist the District Court of Appeal, Second Appellate District, Division Two.

"It having been made to appear to me by the Honorable Lewis R. Works, presiding justice of the District Court of Appeal, Second Appellate District, Division Two, that the calendar of said court and division is congested:

"Now, therefore, in order to expedite the judicial business of said court, and in accordance with the provisions of that certain amendment to the Constitution of the state (Senate Constitutional Amendment No. 15), ratified and approved by the people of the state at the general election held on November 2, 1926, providing for a judicial council, and authorizing the chairman thereof to assign judges to assist a court or judge whose calendar is congested.

"It is ordered that Honorable Harry R. Archbald, Honorable Elliot Craig, and Honorable C. W. Guerin, judges of the superior court of the state of California in and for the county of Los Angeles, are hereby assigned to sit and hold court as justices of the said District Court of Appeal, Second Appellate District, Division Two, for the period of two weeks beginning Monday, December 20, 1926.

"Dated: San Francisco, California, December 14, 1926.

"WILLIAM H. WASTE,

"Chief Justice of the Supreme Court of California and Chairman of the Judicial Council."

The petitioner herein also seeks for a writ of prohibition directed to the aforesaid three superior judges, who are also made respondents herein, commanding them and each of them to desist and refrain from acting as justices of the said District Court of Appeal in the said cause wherein the petitioner is one of the appellants; and for such other and further relief as may be meet in the premises.

The manifest purport of the foregoing application for these writs is that of presenting to this court for present determination the interpretation of that certain recently adopted amendment to the constitution of California known as the "Judicial Council Amendment." Said amendment purports to add to article VI of the constitution a new section to be numbered 1a and also to amend sections 6, 7, and 8 of said article VI. Section 1a thereof provides that "There shall be a judicial council," and provides for the constituent members thereof; and that "The chief justice or acting chief justice shall be chairman"; and that the clerk

of the Supreme Court shall act as secretary of the council.
It contains certain other provisions to be commented upon
in the course of this discussion, but the particular provi-
sion requiring present interpretation is that portion of sub-
division (6) of said section 1a which reads as follows:

"The chairman shall seek to expedite judicial business and
to equalize the work of the judges, and shall provide for the
assignment of any judge to another court of a like or higher
jurisdiction to assist a court or judge whose calendar is con-
gested, to act for a judge who is disqualified or unable to act,
or to sit and hold court where a vacancy in the office of
judge has occurred. . . . The several judges shall co-operate
with the council, shall sit and hold court as assigned."

Before entering upon the discussion as to the scope and
meaning to be given to that portion of section one *a* of said
amendment last above quoted as applied to the immediate
situation before us, it may be well to take note of the fact
that nowhere in the body of said entire amendment are the
designations "Supreme Court" or "District Court of Ap-
peal" made use of as conveying the express intendment of
its framers that these appellate tribunals, or either or any
of them, should come within its terms.  The inference that
such was in part its purpose is to be drawn, if at all, from
two sources, first, from the fact that the constituent member-
ship of the judicial council is to be made up in part by the
designation of the chief justice or acting chief justice of the
Supreme Court as its head, and by the selection of one asso-
ciate justice of said court and of three justices of the District
Court of Appeal as part of the membership of said body;
and, second, from the very general phraseology of the several
provisions of said amendment indicating that its purpose
was that of "simplifying and improving the administration
of justice," "the expedition of business"; the adoption or
amendment of "rules of practice and procedure for the
several courts," and the making and receiving of reports "re-
specting the condition and manner of disposal of judicial
business."  Notwithstanding this paucity of direct reference
in the body of this amendment to the appellate tribunals of
this state, it is urged upon us by certain of the proponents
thereof, appearing in aid of the respondents to this applica-
tion, that the main object and purpose of this amendment to
the constitution was that of its application to these appellate

tribunals, with a view to relieving an existing, and to the minds of some of these an alarming state of congestion in the calendars and judicial business of these tribunals; and that for the attainment of these objects and purposes a most liberal, if not revolutionary, interpretation should be given to its terms. It is further to be noted in this immediate connection that the word "congested" in its application to court calendars is employed but once in the body of said amendment and that in the portion thereof above quoted defining the powers and duties of the chairman of the judicial council in his effort "to expedite judicial business." The extent of such congestion, the tribunals wherein it exists and the precise nature, extent, and duration of such remedial measure as to the framers of this amendment intended the judicial council or its chairman to inaugurate are nowhere dealt with therein outside of the brief paragraph above set forth. Notwithstanding these obvious deficiencies in the way of preciseness of statement as to the tribunals to which its provisions were intended to be applied and also as to the nature and scope of its remedial procedure for the relief of whatever congestion exists in the disposal of judicial business in the courts of last resort, we have arrived at certain preliminary conclusions. [1] They are, first, that it sufficiently appears from the body of his amendment, when read as a whole, that it was intended to have application to the entire judicial system of the state of California, including the Supreme Court and the several District Courts of Appeal; second, that it was intended to confer upon the judicial council certain powers such as are enumerated in subdivisions (1), (2), (3), (4) and (5) of section one *a* of said amendment; third, that it was intended to confer upon the chairman of the judicial council certain powers and duties having reference to whatever state of congestion he may find to exist in the calendars of the courts or judges of this state with a view to a speedy relief of such congestion, and "to expedite judicial business" by so doing. What is the measure and exercise of these powers and duties by the official to whom they are entrusted is the immediate problem presented in the proceeding before us.

[2] As we have already seen, the language employed in this amendment, "To assist a court or judge whose calendar is congested," because of its generality and absence of spe-

cific application and intendment, sheds but little light upon the proper interpretation to be given to this particular provision thereof under review in the instant proceeding.   The phrase "to assist a court or judge whose calendar is congested" is, to say the least, an unfortunate expression in view of the meaning which had already been assigned by this court to a similar phrase in a statute having a similar object.   In the case of *People ex rel.* v. *Hayne*, 83 Cal. 111, 118 [17 Am. St. Rep. 211, 7 L. R. A. 348, 23 Pac. 1], this court construed the phrase "to assist the court" as conferring no judicial functions upon the commissioners provided for by the act of 1889 (Stats. 1889, p. 13) ; but merely invested the commissioner to be appointed under said act with power to perform such preliminary service in the way of examining causes, searching libraries or even drafting such opinions and conclusions as were preparatory to the order or judgment of the court which could only properly be held to constitute the exercise of its judicial power.   It is true that in that case the construction put upon said phrase was constrained by the fact that the legislature had no constitutional power to invest the commissioners provided for in said act with judicial functions, and for that reason the interpretation compelled in that case is not controlling here; but the fact that it was in that earlier case given the foregoing limited interpretation compels us to look beyond its own phrasing for a broader meaning.   We find this broader meaning implicable from a succeeding sentence in the same provision, wherein it is declared that the several judges thus assigned "to assist a court or judge whose calendar is congested" are to "sit and hold court as assigned."   The implication is thus clear that such judges as are thus assigned shall exercise judicial functions while operating under such assignment.

[3]   Having reached this conclusion, we are next brought to the consideration of the tribunal or tribunals wherein the judicial functions of such assigned judges are to be exercised under their said appointment pursuant to the provisions and purposes of this amendment.   This brings us to the individual case before us; and while the determination of this cause involves, strictly speaking, only the validity of the order of the Chief Justice, acting as *ex-officio* chairman of the judicial council, and the further order of the presid-

ing justice of Division Two of the District Court of Appeal in and for the Second Appellate District, it also involves a consideration of those sections of article VI of the constitution which relate to the establishment and constituent nature and powers both of the Supreme Court and of the several District Courts of Appeal and of the membership of each; and for this reason we deem it advisable to deal with the problem before us in its present or possible application to the judicial system of California as a whole. The Supreme Court of California was reorganized by the constitution of 1879 and by the incorporation therein of article VI of said constitution. Section 2 of said article provided that ''The Supreme Court shall consist of a chief justice and six associate justices.'' The section further provided for the division of the Supreme Court into departments, with power in the Chief Justice to assign three of the associate justices to each department and to change such assignments from time to time; and that the presence of three justices shall be necessary to transact any business in either of the departments except such as may be done at chambers, and the concurrence of three justices shall be necessary to pronounce a judgment; any four justices may, either before or after judgment by a department, order a case to be heard in bank. The chief justice may convene the court in bank at any time and shall be the presiding justice of the court when so convened. The concurrence of four justices present at the argument shall be necessary to pronounce a judgment in bank; but if four justices so present do not concur in a judgment, then all of the justices qualified to sit in the cause shall hear the argument, but to render a judgment the concurrence of four judges shall be necessary. In case of the absence of the chief justice from the place at which the court is held the associate justices shall select one of their own number to perform the duties and exercise the powers of the chief justice during such absence or inability to act. The foregoing section of article VI of the constitution has remained unchanged in form to the present time and it is to be noted that in said section and also in section 4 of the same article as originally framed there was no provision for the selection of justices or judges *pro tempore* to act in the place of a justice of the Supreme Court disqualified or unable to act in a cause pending before it. Section 4 of article

VI referred originally to the jurisdiction of the Supreme Court and remained in its original form until the year 1904, when said section was so revised as to provide for the organization and jurisdiction of District Courts of Appeal. Three District Courts of Appeal were then created and the jurisdiction of these defined. The jurisdiction of the Supreme Court was also therein redefined in view of the creation of these intermediate tribunals. These District Courts of Appeal as to their constituency and method of action were framed upon the model of the Supreme Court. One of the justices elected or appointed as such to each was to be the presiding justice thereof. The presence of three justices in each was made necessary for the transaction of any business by such court, except such as might be done at chambers, and the concurrence of three justices was made necessary to pronounce a judgment. This amendment to the original section further provided that whenever any justice of the Supreme Court was for any reason disqualified or unable to act in a cause pending before it, the remaining justices might select one of the justices of a District Court of Appeal to act *pro tempore* in the place of the justice so disqualified or unable to act. The section as amended also contained the provision that whenever any justice of the District Court of Appeal was for any reason disqualified or unable to act in any cause pending before it, the Supreme Court might appoint a justice of the District Court of Appeal of another district or a judge of the superior court to act *pro tempore* in the place of the justice so disqualified or unable to act. This section as amended also provided for the granting of hearings before the Supreme Court in causes heard and determined by District Courts of Appeal. Section 4 of article VI of the constitution as thus amended remained in the above form until the year 1918, when it was again amended so as to provide for the creation of two additional divisions to be added to the District Courts of Appeal, similarly constituted as to membership and powers, one of which was to form Division Two of the District Court of Appeal in and for the First Appellate District and the other of which was to form Division Two of the District Court of Appeal of the Second Appellate District. This later amendment also provided that in case of the appointment of a justice or justices *pro tempore* for the Supreme Court such justice

or judge *pro tempore* might be selected from among the judges of the superior court as well as from the District Court of Appeal. The section was further amended so as to provide that the presence of two justices should be necessary for the transaction of business in the District Courts of Appeal and the concurrence of two justices in such courts should be necessary to pronounce a judgment. The foregoing sections of article VI of the constitution have since remained in their original or thus amended form up to the time at least of the adoption of the recent amendment to article VI of the constitution here under review.

Before proceeding to consider the provisions of the foregoing sections of article VI of the constitution in the light of the recent amendment it may be timely to take note of certain decisions of the Supreme Court which have an important bearing upon their interpretation. The first of these is that of the very early case of *People* v. *Wells,* 2 Cal. 198, wherein the question arose as to the power of the legislature to declare that a vacancy existed in the constituent membership of the Supreme Court by reason of the fact that one of its duly elected justices was temporarily absent from the state; and also as to the power of the Governor to appoint a justice to fill such declared vacancy. Chief Justice Murray in a remarkably well-reasoned opinion declared the act of the legislature to be unconstitutional and the appointment by the Governor to be invalid. In so doing he quoted the language of the constitution of 1849, which stated that the Supreme Court of California ''shall consist of a chief justice and two associate justices,'' and held that these words ''limit the number and *ex vi terminorum* forbid the possibility of there being more than three.'' Another case bearing upon the subject is that of *In re Jessup,* 81 Cal. 408, 459 [6 L. R. A. 594, 21 Pac. 976, 22 Pac. 74, 1028], wherein in certain of the later stages of that somewhat famous case this court had occasion to consider the effect of a clause which had been added to section 45 of the Code of Civil Procedure, which provided in substance that the concurrence of five justices of the Supreme Court should be required in order to the granting of a rehearing after a department decision. Chief Justice Beatty, in delivering the opinion of the court upon this question, declared that this provision of the code was invalid as an attempt to

change the constitutional number of the membership of the Supreme Court required to concur in a judgment or order. The case of *Reeve* v. *Colusa Gas etc. Co.*, 151 Cal. 29 [91 Pac. 802], has also a bearing upon the subject in hand. In that case the matter of the interpretation of the provision which was added to section 4 of article VI of the constitution in 1904, authorizing the substitution of a justice of the District Court of Appeal in the place of a justice of the Supreme Court disqualified or unable to act in a cause pending before it, came up for consideration. The above-entitled case had been decided in department. A rehearing was granted by the court in bank and the cause was placed upon the calendar of the full court for further hearing. In the meantime Justice Sloss had become a member of the court, and, deeming himself disqualified through interest, declined to sit in the case. Justice McFarland was ill and unable to be present at the hearing in bank. Accordingly the court selected Justices Cooper and Harrison of the District Court of Appeal in and for the First Appellate District to act *pro tempore*, the former in the place of Justice Sloss and the latter in the place of Justice McFarland. The records of this court disclose that said cause was placed upon the calendar of the court in bank for hearing, and was argued upon the twenty-third day of February, 1906, before the court thus constituted; and was decided upon June 21, 1906, by a four to three decision, Justices Shaw, Angellotti, Harrison, and Chief Justice Beatty joining in the main opinion and Justices Henshaw, Lorigan, and Cooper dissenting. A petition for rehearing was filed on July 10, 1906. When such petition came on for judicial action Justice McFarland, having recovered from his illness, was able to function and did so by joining the minority in an order granting a rehearing, on July 19, 1906, in which action Justice Harrison did not participate, but Justice Cooper did, Justice Sloss as to that cause being still disqualified. Thereupon the respondents moved the court to set aside its order granting such rehearing upon the ground that Justice Harrison, sitting *pro tempore* for Justice McFarland as to that cause, should, and Justice McFarland should not, have acted in the premises. The court, without going deeply into the merits of the matter, on April 4, 1907, decided that the order should stand. The case is interesting not so much on ac-

count of what was expressly decided but because of the incidental light which it casts upon the operations of the Supreme Court under the amendment providing for the selection of justices *pro tempore* when one or more of the regularly constituted members of the court were disqualified or unable to act in respect to any cause or matter requiring the exercise of judicial functions. Our records disclose that between February 23, 1906, when Justices Cooper and Harrison were selected to act as justices *pro tempore* in said cause, and April 4, 1907, when the decision of the court upon the motion to set aside its order granting a rehearing was handed down, the Supreme Court functioned as a judicial tribunal frequently with Justices Sloss and McFarland participating in the calling of calendars and decisions of causes other than the Reeves case; and that, in fact, upon the very day, viz., June 21, 1906, upon which the Reeves case was originally decided by the four to three decision of the court in bank above referred to, the Supreme Court in bank decided the case of *People* v. *Weber* (149 Cal. 325 [86 Pac. 671]), in which decision Justice Sloss participated and Justice Cooper acted as justice *pro tempore* for Justice McFarland, who was still unable to act, but for whom Justice Harrison was still acting in the Reeves case as a justice *pro tempore.* We thus arrive at a cotemporaneous interpretation of the scope and effect of the constitutional provisions permitting the selection of justices *pro tempore* in the Supreme Court and in the District Courts of Appeal prior to the adoption of the most recent amendment here under review. The importance of the foregoing cotemporaneous interpretation of the constitutional provisions relating to justices *pro tempore* becomes apparent when we consider more closely the constituent nature and method of functioning of these two tribunals under the constitution as it stood prior to its recent amendment. Section 2 of article VI provided that "The Supreme Court shall consist of a chief justice and six associate justices." Section 4 of the same article as amended in 1918 provides that the Courts of Appeal for the First and Second Appellate Districts shall each consist of two divisions of three justices each. The court of the Third Appellate District shall consist of three justices. Section 2 of said article defines how the Supreme Court shall perform its judicial functions. The court may sit in departments

and in bank. When the court sits in its departments each
of its said departments shall have three associate justices
and each of said departments shall have the power to hear
and determine causes. The presence of three justices shall
be necessary to transact any business in either of the de-
partments, and the concurrence of three justices therein shall
be necessary to pronounce a judgment. When the court sits
or acts in bank the concurrence of four justices shall be
necessary to order a case, heard and decided in department,
to be heard in bank; and the concurrence of four justices
shall be necessary to pronounce a judgment, provided that if
a cause is orally argued in bank the concurrence of four
justices who have heard such argument shall be necessary to
pronounce a judgment therein. In the creation of the
several District Courts of Appeal the same general plan and
procedure for the functioning of these courts were followed
and the same powers granted with regard to *pro tempore*
justices. It would thus appear that an individual justice of
the Supreme Court or of the District Court of Appeal pos-
sessed, as such, no power to perform any judicial function
other than that to be performed by him as a component
member of a group acting either in department or in bank in
the Supreme Court or functioning in a like group relation in
an appellate court. The persons who were selected to act as
justices *pro tempore* of either court blended into the already
constituted entity of which for the time being they were to
form a part, and in so doing replaced those individual mem-
bers of that entity who in relation to particular causes or
calendars were disqualified or unable to act. In so doing
they "assisted the court"; and it is interesting to note that
the plan of calling in *pro tempore* justices as adopted in
1904 was evidently intended to be one of the ways then
devised to relieve "congestions"; since the same amendment
which created the District Courts of Appeal for that then
much needed relief also provided for the maintenance of
the man power of both courts by the selection of justices
*pro tempore* in each as the emergency required. It has,
however, never been considered, nor is it now contended,
that the power then reposed in the justices of the Supreme
Court or of the District Courts of Appeal to make selections
of justices or judges to act in the stated emergencies as jus-
tices *pro tempore*, however flexible its operation as disclosed

in the Reeves case, could be so indefinitely expanded as to permit either of these tribunals to so far replace its constituent membership as to create or constitute a Supreme Court or a District Court of Appeal so far composed of justices *pro tempore* as to exercise the judicial functions of the regularly constituted tribunal. It has never, for example, been considered, nor is it now contended, that under the terms of the amendments of 1904 or 1918 of the constitution relating to *pro tempore* justices that the members of the Supreme Court or District Courts of Appeal were thereby invested with the power to substitute for themselves, acting as a group in the performance of the judicial function, another body of men composed of justices *pro tempore* and as such empowered to exercise the functions of a Supreme Court or District Court of Appeal. In other words, it was never intended to provide for the creation of *a court pro tempore*. To so interpret these provisions in said amendments, evidently intended to afford temporary and emergency relief, would be to encourage the violation of a very vital principle of popular government which is none other than that of the right of the people of a commonwealth to have their essential rights, liberties, and interests in respect to person and property heard and determined by courts of last resort, the constituent membership of which is composed of public servants of their own selection. That the people might transfer the direct exercise of this selection to those whom they may have chosen to administer the functions of our representative scheme of government is undoubted, but the text of such transfer, whether embodied in a constitution or a statute, should be plain and unambiguous.

[4] Having thus far interpreted the several provisions of article VI of the constitution as these existed prior to the recent amendment of said article known as the "Judicial Council Amendment," we now arrive at the interpretation of said amendment. In so doing we are to treat said amendment as a whole and are to consider it in the light of our foregoing interpretation of the provisions of said article VI of the constitution which it purports to amend. We are of course to endeavor to construe it in the light of whatever evils or defects in the administration of justice we shall find it to have been designed to remedy. In this latter effort we

have not found ourselves greatly aided by considerations
supposed to have preceded or even attended the formulation
of this measure; nor by suggestions made to the electors
through whatever propaganda accompanied its proffer for
adoption or rejection by said electorate.   [5]   Such aids to
the interpretation of a written document while available to
the courts are not at all to be considered as controlling, since
whatever may have been the intent of the proponents of a
particular change in a law must at the last analysis be de-
rived from the language of the proposed enactment purport-
ing to effect such change.   (*Tynan* v. *Walker*, 35 Cal. 634
[95 Am. Dec. 152]; *Estate of Young*, 123 Cal. 337 [55 Pac.
1011], and cases cited.)   When we examine this amendment
as a whole we discover that it embodies two main purposes,
the first of which in the order of expression is that portion
of section one *a* thereof which proceeds to create a judicial
council and to invest that body with certain powers and
duties chiefly administrative in character, and, in the main,
similar to provisions in the statutes of several other states
relating to judicial councils.   The other purpose disclosed by
an inspection of this amendment is that expressed in subdi-
vision (6) thereof which purports to invest the chief justice
of the state, acting *ex officio* as chairman of the judicial
council, with certain powers and functions through the exer-
cise of which he is to "seek to expedite judicial business and
equalize the work of the judges."   It is with the scope and
method of the exercise of these powers and functions that
we are, in the instant proceeding, chiefly, if not wholly, con-
cerned.   In entering upon this inquiry we do not feel our-
selves bound to choose between the rules defining the diver-
gent paths of strict and liberal interpretation; but if we
were so bound we would feel constrained to follow the path
of liberality in interpreting and applying the terms of this
amendment with a view to aiding in the achievement of its
avowed object, viz., that of "expediting judicial business,"
since as a court of last resort we are more vitally concerned
than any other official or unofficial organization in this state
in achieving that result.   We are not, however, for that
reason to neglect or minify those other certain canons of
interpretation which should guide and control the courts in
determining the extent and limitations of proposed changes
in established laws and especially in the organic law.   One

of the most important of these is that relating to repeals by implication. [6] It is a doctrine of universal acceptation that repeals by implication are not favored in the interpretation of laws. No higher authority for this doctrine need be cited than that of Judge Cooley in his great work on Constitutional Limitations, wherein he thus states the rule and outlines its application: "Repeals by implication are not favored; and the repugnancy between two statutes should be very clear to warrant a court in holding that the later in time repeals the other when it does not in terms purport to do so." (Cooley's Constitutional Limitations, 7th ed., pp. 216, 217, and cases cited.) The rule is even more strongly stated by the latest utterance of this court upon the subject wherein it is declared: "Repeals by implication are not favored and are recognized only when there is an irreconcilable conflict between two or more legislative enactments." (*Railroad Com.* v. *Riley,* 192 Cal. 54, 57 [218 Pac. 415, 417], and cases cited.) The older authorities supporting this rule are fully collated in 23 Cal. Jur., pp. 694, 695. [7] The application of this principle to the instant problem is attended with another principle of interpretation of almost equal importance, which is that when in any enactment there appears an express modification or repeal of certain provisions in a former enactment, such express modification or repeal of the portions thereof thus affected will be held to disclose the full intent of the framers of the later enactment as to how much or what portion of the former it was intended to modify or repeal. This upon the principle *expressio unius, est exclusio alterius;* and in such a case an implied modification or repeal of such portions of the former law as are not expressly referred to as being repealed or modified is to be all the more avoided in determining the intent and effect of the latter enactment. (*Crosby* v. *Patch,* 18 Cal. 439, 441.) [8] The application of the foregoing principle to the instant situation is this: By the terms of section 6 of said amendment the previously existing provisions of the constitution respecting Superior Courts are expressly modified and to that extent repealed in so far as these related to the number of superior judges who might function in said courts in the several counties of California. [9] This was accomplished by the provision in said section 6 of the amendment stating that "There may be

as many sessions of a superior court at the same time as there are judges elected, appointed or assigned thereto.'' This express provision read in connection with the language of section one *a* of said amendment would expressly authorize the chairman of the judicial council to increase the number of those who could exercise the judicial function in the superior courts; but there is no such express provision with relation to the appellate courts; and the absence thereof renders fully applicable both of the foregoing rules forbidding repeals by implication. Bearing in mind these salutary rules and bearing in mind also the interpretation which has already been given to the several provisions of article VI of the constitution as they read prior to the recent amendment, we apply ourselves to the specific language of the amendment itself. Subdivision (6) of section one *a* thereof, as we have seen, provides that the chairman of the judicial council in his effort to expedite judicial business ''shall provide for the assignment of any judge to another court of like or higher jurisdiction to assist a court or judge whose calendar is congested.'' The phrase ''to assist a court'' in the above quotation is the only one with which we are presently concerned, since as to the Supreme and Appellate Courts, it is only such courts which, in their group constituency, as distinguished from the judges or justices thereof, have calendars which could be congested. [10] The power with which the chairman of the judicial council is therefore invested by the foregoing clause in said amendment is that of assigning judges or justices ''to assist'' the Supreme Court or the several District Courts of Appeal as these courts were theretofore constituted under the terms of the constitution prior to said amendment, whenever the calendars of said tribunals had become congested. It was these courts as thus constituted which were to be thus ''assisted''; and the assistance thus to ·be rendered was to be that supplied through the assignment of a justice or judge not already a constituent member of the court to be thus assisted to be and to act as one of the members thereof; and in the language of a later clause in said section of said amendment to ''sit and hold court as assigned.'' The authority of the judge or justice thus assigned ''to sit and hold court'' must, however, be interpreted in the light of the already existing provisions of the constitution relating to the

constituent nature of each of said tribunals; and since section 2 of article VI had already provided that "The Supreme Court shall consist of a chief justice and six associate justices"; and since section 4 of said article had, as amended in 1904 and 1918, similarly provided that the several District Courts of Appeal or their divisions should consist of three justices each; and since, as we have already seen, these respective tribunals under said constitutional provisions could only function in certain defined groups composed of the individual justices thereof, it would result irresistibly that the judge or justice so assigned by the chairman of the judicial council "to sit and hold court as assigned" could only do so as a member of one or the other of such groups and could only exercise a judicial function in such relationship to the already constituted membership of said courts respectively as would not change or increase the designated number of the constituent membership thereof as fixed by the terms of sections 2 and 4 of said article VI of the constitution as these read prior to said recent amendment; for were it otherwise, necessarily these prior sections of the constitution would to that extent have been by implication repealed. In obedience to the above-stated rule against repeals by implication we should therefore diligently seek for an interpretation of the foregoing clauses in the recent amendment as would not have such effect; and for the like reason we should earnestly endeavor to so construe the same as not to effect any change in the groupings of either of said tribunals or in the number of the departments or divisions thereof as fixed by the provisions of sections 2 and 4 of said article VI of the constitution as these read prior to said recent amendment. From these considerations certain deductions would seem logically to follow. [11] The first of these is that in making the assignment of any justice or judge or of any number of such "to assist" the appellate tribunals the chairman of the judicial council was empowered to invest the persons so selected and assigned with no other or different official relation to such courts than that held by the already regularly constituted members thereof, which, as we have seen, was merely that of blending into the group constituency thereof in order, in that relation, to exercise the judicial function. In other words, the individual justice or judge so assigned was to occupy substan-

tially the same relationship to the already constituted group denominated "the court" as that occupied by justices *pro tempore* under the terms of article VI of the constitution as it stood prior to such amendment. [12] In stating this conclusion we are not, however, to be understood as holding either that the former provisions of article VI of the constitution relating to justices *pro tempore* has been repealed or that the change in the constitution wrought by this amendment has not broadened the conditions which, under the constitution as it formerly stood, were a limitation upon the power of appointment of justices *pro tempore.* As to the first of these suggestions, it would seem to be apparent that it was the express purpose of the framers of this amendment to retain unchanged in their terms, except in one regard, the former constitutional provisions relating to the appointment of justices *pro tempore,* since by the succeeding sentence of the paragraph of section one *a* immediately under review, the chairman of the judicial council is given power to assign a justice or judge "to act for a judge who is disqualified, or unable to act." When we read this express transfer of power to the chairman of the judicial council to assign justices and judges *pro tempore* under the precise conditions which attended their selection prior to said amendment and when we consider the same in the light of the preceding clause authorizing the assignment of justices or judges "to assist" these courts, we must assume, in order to give effect to both, that it was the intention of the framers of this amendment to so broaden the former provision as to authorize the selection of justices or judges *pro tempore* to assist said courts when their calendars were congested, although the regularly constituted justices of said courts who were thus, for the purpose of hearing particular causes or calendars, replaced *were neither disqualified nor unable to act.* It may be argued against this interpretation that the phrase "to assist a court or judge whose calendar is congested" if given this broader meaning removes the necessity for the succeeding phrase "to act for a judge who is disqualified or unable to act." This argument, it must be conceded, brings us face to face with the following dilemma: If the first above-quoted clause is *not* to be given the broader meaning above assigned to it, then it becomes merely waste and idle words, since the power to make use of *pro tempore*

judges under the former terms of the constitution would be in nowise changed; on the other hand, as is argued, if said first quoted provision *is* to be given such broader meaning, then the succeeding clause becomes waste and idle, since it is fully covered under the broader meaning of the preceding grant of power. Confronted with this situation we are reminded that between Scylla and Charybdis the wise Ulysses found safety in a middle course and that we may profit by the ancient example. **[13]** Between two apparently conflicting interpretations of a law equally adaptable, that one is to be preferred which will give effect to the entire language thereof rather than that which would destroy any portion of it and to that extent defeat the legislative intent. (Civ. Code, sec. 3541; *Cuthbert* v. *Woodman,* 185 Cal. 43, 45 [195 Pac. 673].) It is possible to preserve in its entirety the foregoing paragraph in subdivision one *a* of said amendment with the aforesaid broader significance assigned to the first above-mentioned clause thereof by assigning to the succeeding clause thereof an intent on the part of its framers to transfer the pre-existing power of selecting *pro tempore* judges, to serve in cases of disqualification or inability to act on the part of those whom they were to replace, from the courts formerly invested with the exercise of such power, to the chairman of the judicial council in the interest of the unification of action in that regard; and that in order to clarify such intent, the particular clause referring to such emergencies and providing for such transfer was inserted in said amendment. Such an interpretation enables us to give effect to the entire provision without the violation of any of the foregoing canons of interpretation. That such an interpretation of the foregoing provisions of the recent amendment, when read as a whole, would be susceptible of practical application we entertain no doubt; and that such an interpretation would involve no necessary repeal by implication or otherwise of the former provisions of the constitution relating to the constituent membership or functioning of either the Supreme Court or District Courts of Appeal we are equally sure. And we would go further and say that such a plan, if put into practical operation, would materially assist said courts in relieving congested calendars, wherever such exist, through increasing the man power of such courts without disturbing either their essential constituency or method

of operation in the dispatch of their judicial business. A case and an illustration may make this more clear. In the matter of *People* v. *Ruef*, 14 Cal. App. 576 [114 Pac. 48, 54], Chief Justice Beatty in the opinion touching a rehearing in the Supreme Court referred interestingly to the methods of work and of the activities of the members of such court preparatory to the final exercise of the judicial functions of the court itself. In addition thereto it may be said with reference to both the Supreme Court and the several District Courts of Appeal that only a small portion of the time of the individual membership of each of said courts is, during any period, occupied in such group action as that of hearing calendars or handing down opinions. During the greater portion of the year the individual members of these courts are occupied in chambers; in examining briefs and records; in library research; in preparing opinions or reviewing those of their associates similarly prepared. These essential labors may be and frequently in the past have been performed by individual justices in cases in which they were qualified to act while their associates with the aid of justices *pro tempore* sitting in their places were occupied in calling calendars or hearing arguments in which they were disqualified to act, or in which for one reason or another they were unable to be present in court session. The case of *Reeve* v. *Weber, supra,* well illustrates the flexibility of the provisions of the constitution relating to justices *pro tempore* prior to the recent amendment; and we can see no serious obstacle in the way of so far enlarging that flexibility as to permit justices or judges, sitting and acting in a *pro tempore* relation to the regularly constituted courts, performing similar functions when the regularly elected or appointed members thereof are neither disqualified nor unable to act. The putting into operation of such a plan would seem to be merely a matter of routine and as such within the entire control of the members of these courts using the same for the more efficient dispatch of judicial business and the relief of congested calendars, without in any way disturbing the constituent organization of such courts as ordained by the constitution prior to the adoption of said amendment.

[14] When this much has been concluded it would seem to logically follow that the order made by the chief justice acting *ex officio* as chairman of the judicial council in assign-

ing Superior Judges Archbald, Craig, and Guerin "to assist the District Court of Appeal, Second Appellate District, Division Two," may be upheld as a proper exercise of his powers under the terms of said amendment. It is contended that the use in said order of the phrase to the effect that the judges so assigned "are hereby assigned to sit and hold court as justices of the District Court of Appeal" goes beyond the granted powers of that official under the terms of said amendment as the same has been herein interpreted; but this phrase, if construed to refer to these . judges in their individual relation to said court, is subject to no such objection. The difficulty with this proceeding springs not from the order of the chairman of the judicial council above referred to, but from the interpretation sought to be placed thereon by the division of the District Court of Appeal to which these judges have been so assigned. **[15]** Pursuant to such assignment the said Second Division of said District Court of Appeal made an order that the particular cause wherein the petitioner herein is an appellant be placed on the calendar of said division for hearing and argument before the aforesaid three superior judges, to whom, as said order reads, "the said cause is hereby assigned for hearing, determination and judgment." It thus appears as the necessary effect of the foregoing order that the three superior judges so individually assigned to assist said division of the District Court of Appeal are to sit and act not in that individual relationship to said court which each of them would otherwise have occupied as justices *pro tempore* under the terms of the constitution as it formerly read and as we have herein construed it to mean, but in an entirely different relationship, viz., that of a group of justices *pro tempore* sitting as a court, performing all of the judicial functions of a court and particularly performing all of the judicial functions of a division of said Court of Appeal. It would seem plain that in thus setting up what is in effect a new group of justices who are to thus sit and act as a court and in effect as a division of said court, the District Court of Appeal, so attempting to do, could be upheld in such action only upon the theory that the provisions of section 4 of article VI of the constitution, as amended in 1918, have by implication been repealed in so far as those provisions declare that there shall be but two divisions of said District

Court of Appeal. Again referring to the principle that repeals by implication are not favored and to the special application of such principles to cases wherein the suggested and altogether implied repeal is revolutionary in its character and effect, we have earnestly sought for an interpretation of the provisions of section one *a* of said amendment which would entail no such extreme consequences, and which would yet enable said provision to be given such operation and effect as would suffice to accomplish the purposes which prompted its adoption. Such an interpretation is the one already herein declared, which involves no material repeal or alteration in the previous provisions of the constitution; and which, if given operation in the spirit of liberality and flexibility with which the previous changes in the organic law relating to justices *pro tempore* have been construed and applied, but with the broader scope in one respect which we think this amendment in its application to appellate tribunals permits, would in our opinion be productive of the desired result. This result would be to permit assigned justices or judges under the amendment to function as justices or judges *pro tempore* functioned under the provisions of the constitution as they existed prior to the amendment, with the added right to so function in causes wherein the regular justices so replaced were neither disqualified nor unable to act. The assistance so afforded would seem to meet the necessity for added man power in such courts as is contended for by counsel for respondents and at the same time not disturb the operations of the regularly constituted court, as contended for by counsel for petitioner.

We therefore hold that the order of Division Two of the District Court of Appeal in and for the Second Appellate District in so far as it undertakes to authorize Judges Archbald, Craig, and Guerin to sit and act in the group relation of a court and of a division of said District Court of Appeal and in such relation and capacity to hear, determine, and adjudge the case of the appellant and petitioner herein pending upon appeal in said District Court of Appeal is invalid; that such order of said division of said court should upon this application for a writ of review be annulled; and that a writ of prohibition should issue enjoining and prohibiting the respondents Archbald, Craig, and Guerin from exercising the judicial functions of a court and from hear-

ing, determining, and adjudging the cause of the appellant and petitioner herein in that capacity and under the direction of said invalid order.

The said order is annulled and a writ of prohibition is ordered to issue accordingly.

Waste, C. J., Shenk, J., Preston, J., Curtis, J., Langdon, J., and Seawell, J., concurred.

Rehearing denied.